**Affirmed and Opinion filed November 8, 2016.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-16-00427-CV

---

## IN THE MATTER OF C.M.M.

---

**On Appeal from County Court at Law No. 1**
**Galveston County, Texas**
**Trial Court Cause No. 15JV0434**

---

## O P I N I O N

Appellant C.M.M. is a juvenile charged with capital murder of his mother and her unborn child. *See* Tex. Penal Code Ann. § 19.03(a) (Vernon Supp. 2016). He challenges the order granting the State's petition for the juvenile court to waive jurisdiction and transfer him to criminal district court. *See* Tex. Fam. Code Ann. § 54.02 (Vernon 2014), § 56.01 (Vernon Supp. 2016).

Appellant challenges the order on grounds that (1) there is no probable cause to believe he committed the alleged offense because there is no evidence of the unborn child's cause of death, and (2) the trial court abused its discretion in

transferring the case because the trial court did not sufficiently consider the required factors. We affirm.

## FACTUAL BACKGROUND

### A.     Appellant's Activities

Appellant was 14 years old in September 2015 and lived with his mother, Nicole.[1] Recorded statements made to police and admitted into evidence without objection at the transfer hearing describe the following events occurring between Tuesday, September 22 and Sunday, September 27, 2015.

Around 10:00 p.m. on Tuesday, appellant texted his friend, Trace, to see if Trace and his sister, Beth, wanted to get together. Beth and Trace agreed, snuck out of their house, and met appellant at a nearby store. Appellant was driving a late-model black Nissan, which he told them his mother's pimp bought for him. He also had a large amount of cash; the bag holding the money had a sticky note with "900" written on it. Appellant told them the money was from Nicole's pimp as well. As soon as they got in the car, appellant offered his friends money from a "big stack of twenties" in case they wanted to buy anything to eat or drink. Appellant then drove his friends to pick up Ella, Trace's girlfriend.

Appellant drove Beth, Trace, and Ella to a residence where he paid $40 for marijuana while the three passengers stayed in the car. All four teenagers then went to a park, where they drank alcohol and smoked marijuana. Beth and appellant talked for one to two hours in the park. Beth described appellant as "chill" while she was with him. Trace, however, said appellant was acting "sketchy" that evening—by which he meant appellant was "always looking around, checking his phone, stuff like that."

---

[1] We use fictitious names to refer to the complainant and witnesses in this case.

The group left the park and appellant said he wanted to drive by his house to see if his mother or the police were there. No one asked appellant why he thought the police would be at his house. Neither Beth nor Trace knew what his house looked like or where he lived. They knew only that appellant did not stop or slow down at a house. He then drove his three friends to a fast food restaurant and paid for their food.

At some point during the evening while the four were in the car, appellant said his mother was pregnant and he did not want a baby brother. Appellant also said he told his mother he would kill her or the baby. Then he told his friends he was just joking and would not do that. Beth took his statement as a joke. Trace recalled that a few months earlier appellant told him Nicole was pregnant; he did not want a sibling; and he would "beat the [expletive]" out of the baby.

Appellant announced he was driving out of town that night and invited his friends to accompany him. They declined. At Beth's request, appellant drove them all home after midnight.

Appellant drove to Seguin, Texas early Wednesday to see his friend, Carlos. He arrived before dawn and waited until Carlos was out of school. He then texted Carlos and told him he was coming to see him. When Carlos asked why, appellant said he did not want to talk about it until they could talk in person.

When Carlos got home, he and appellant talked in the Nissan. Carlos saw cuts on appellant's hands. Appellant told Carlos he found his mother in the living room stabbing herself and he "finished her off" by holding a towel over her mouth and nose to "put her out of her misery." Carlos believed Nicole was high on drugs at the time. Carlos urged appellant to turn himself in right away, but appellant refused.

Appellant, Carlos, and Carlos's mother drove to Houston and stayed at the Astro Inn. Appellant drank alcohol and smoked marijuana. Carlos was scared and did not tell his mother what appellant had told him. It appears Carlos's mother did not know Nicole was dead because at some point, she instructed the boys to go "make things right" with Nicole.

## B.    Discovery of the Body

Neighbors noticed on Wednesday that the front door to Nicole's house was slightly ajar. One neighbor entered the house on Saturday, discovered Nicole's body on the kitchen floor, and called the police. It later was estimated Nicole had been dead for three or four days when her body was discovered.

Detective Sergeant Spruill, Detective Walton, and Detective Samuelson of the La Marque Police Department arrived at the scene, which Spruill described as "violent" and "horrific." The kitchen floor was covered with blood. Spruill said it looked like somebody had been "sliding around in the blood, running barefoot through the blood." A pair of slip-on shoes with blood on them sat on the floor inside the entrance to the kitchen. A blood-covered knife with a bent tip rested on a night table in a room determined to be appellant's bedroom. Pants and a blue jacket lay crumpled on the bathroom floor. The clothes were surrounded by bloody shoeprints. While at the house, Spruill and Walton learned appellant lived in the house but was not there, and a car was missing. At that point, they did not know if appellant was a victim, a suspect, or neither. They reported him as a missing person.

## C.    Appellant's Statements to Police

Appellant called relatives on Sunday, and an aunt picked him up. Appellant left the Nissan at the Astro Inn. The aunt called the police and said appellant was with her and his paternal grandparents at their house in Houston. Spruill, Walton,

4

and Lieutenant Waggoner, also of the La Marque Police Department, drove to the grandparents' house, where appellant was sitting on the couch. Either he or a relative said the family already knew Nicole was dead.

As a located missing child, appellant was supposed to be returned to his father. Appellant adamantly refused to go with his father. His aunt and grandparents also expressed concern about appellant being with his father. The police officers asked appellant "if he wanted to talk about it," and he said yes. Appellant rode in Waggoner's vehicle to go to the police station. On the way, appellant directed the officers to the Astro Inn so they could recover the Nissan. His grandparents were offered the opportunity to ride with appellant, but they elected to follow in their own car. They were at the station while he spoke with the officers.

Appellant was not then considered to be a suspect in Nicole's murder. Nevertheless, the officers had him admonished by a magistrate in case he became a suspect during the interview.

The interview lasted two hours and twenty minutes. Spruill, Walton, Waggoner, and Samuelson each questioned appellant; for most of the time, only two officers were in the room. A recording of the interview was admitted into evidence over appellant's objection. Spruill's written summary of the interview also was admitted over appellant's objection.

Appellant's recounting of events changed over the course of the interview. In appellant's first version of events during his interview, appellant said he and Nicole were arguing on Tuesday about his attendance at an alternative high school. After the argument, appellant said, Nicole left with a white male whom appellant assumed to be her boyfriend. The man and Nicole left in an Escalade, but the Nissan remained at the house. On Wednesday around 6:00 p.m., Nicole was still

gone, so appellant left in the Nissan to go pick up Beth and Trace. After spending the evening with them, appellant drove to Seguin to see Carlos.

The officers noticed that appellant made inconsistent statements regarding which cell phone he used to contact his friends. When asked, appellant said the clothes he was wearing during the interview were the same clothes he wore when he left his house on Wednesday.

Asked how he felt about his mother's death, appellant said he felt terrible and had been crying all day. He said he did not know how she was killed, and he had not been "able to do any research." The officers told him they believed he knew something about the murder. Appellant responded that if he was going to kill somebody, he "would have at least cleaned up the body and tried to hide it somewhere." He also said, "[I]f I had murdered my mom, I would have rolled her body up in a blanket or something and put it in the car and drove somewhere. That's how I would have done it, but that's my mom even then, so I wouldn't do that in the first place." To that point, about 40 minutes into the interview, there had been no mention of what the crime scene looked like or the amount of blood at the scene.

The officers repeatedly encouraged appellant to tell his side of the story or else "the evidence would tell the story." He said he had been scared to tell, but he found Nicole stabbing herself because she was high on methamphetamine. He was outside painting a cabinet, then came in and found her on the floor bleeding and "pretty much unconscious." Appellant said he did not know what to do, so he held her and pulled the knife from her throat. The tip of the knife was bent. Because "it was too late for her," he told officers he "grabbed a wire" and strangled her with it.

The officers expressed their disbelief that Nicole was stabbing herself. Appellant insisted he was telling the truth—that she stabbed herself and was

"barely breathing" so he "choked her" because he wanted to "put her out of her misery." He told them her legs were crossed when he found her. Crime scene photos admitted into evidence show Nicole's legs crossed at the ankles, but appellant did not see those photos before he mentioned the position of her legs.

Spruill testified at the transfer hearing regarding his reaction to appellant's statement about his mother's legs:

> [H]e said that her legs were crossed, which . . . drew some concern just for the fact alone when you walk in and you see your mother laying on the floor with that amount of blood and you indicate you recall her legs being crossed. But that was a corroborating statement on his part to the . . . crime scene.

As the officers continued to challenge appellant's story, appellant again said he found Nicole on the kitchen floor near the sink "killing herself" with a knife in her throat. When appellant was asked why she would stab herself, he said he believed she felt bad about taking methamphetamine while she was pregnant. He also said Nicole told him at some point that she could not pay for an abortion because she had to take care of appellant.

Appellant said he was mad she was "doing this" so he "stabbed her a couple of times, too." When asked why, appellant said, "In a way I guess you can say I didn't want her to live. I didn't feel like she deserved to because she has lost all my siblings." He said he stabbed her in the back of her neck because he thought it would be the fastest cause of death. Appellant told the officers he dragged her to the middle of the floor but did not stab her any more. He said she was bleeding and he did not want her to suffer, so he choked her.

Then, appellant said, he undressed and took a shower. He said he had been wearing a blue jacket and pants, not the clothes he was wearing at the time of the

interview, as he had stated earlier. He then dressed, took money, and left. He came back and she was not breathing. He put the dog in the bathroom and left again.

## D.    The Autopsy

Nobby C. Mambo, M.D. of the Galveston County Medical Examiner's Office conducted an autopsy on Nicole's body. The autopsy report was admitted into evidence on appellant's proffer.

A two-strand electrical cord nearly a foot long was tightly wrapped around Nicole's neck. The cord was associated with a fracture of her left hyoid bone. Nicole had 55 stab wounds on her scalp, temple, forehead, cheek, jaw, neck, shoulders, chest, back, arms, hands, and thighs. Some of the wounds were superficial; some penetrated muscles or other soft tissue. Blood tests revealed positive results for alcohol (specifically ethanol), amphetamine, and methamphetamine.

A male fetus estimated to be of 17 weeks' gestation was in Nicole's uterus. Several loops of the tri-vessel cord were around its neck.

Dr. Mambo concluded the cause of Nicole's death was strangulation and the manner of death was homicide. The autopsy report does not include findings on the cause or manner of the fetus's death.

### TRANSFER HEARING

The State instituted this case in October 2015 by filing a petition in a county court at law, sitting as a juvenile court, alleging appellant engaged in delinquent conduct. In February 2016, the State filed a petition for waiver of jurisdiction and discretionary transfer to district court. *See* Tex. Fam. Code Ann. § 54.02.

The trial court conducted a hearing on the State's transfer petition over the course of four days in May 2016. *See id.* § 54.02(c). The State presented testimony

from Spruill, Walton, and Jenine Collins Boyd, Ph.D., a psychologist who evaluated appellant. Appellant presented testimony from Walton; Bryan Sweeney, Ph.D., another psychologist who evaluated appellant; a friend of appellant's family; an officer with the Galveston County Juvenile Justice Department; and appellant's grandfather. Nearly 150 exhibits were admitted into evidence, including recorded statements by appellant and other witnesses.

At the conclusion of the hearing, the trial court orally announced it would waive jurisdiction and transfer the case to district court. The court later signed an order specifically stating the reasons for waiver. *See id.* § 54.02(h). This appeal timely followed. *Id.* § 56.01(c)(1)(A).

## LEGAL STANDARDS

### A. Standards for Waiver of Juvenile Jurisdiction

Texas juvenile courts have exclusive, original jurisdiction over cases involving what otherwise would be criminal conduct by children 10 years of age or older but younger than 17 years of age. Tex. Fam. Code Ann. §§ 51.02(2)(a), 51.03(a)(1), 51.04(a) (Vernon Supp. 2016). If a juvenile court determines after an evidentiary hearing that certain requirements are satisfied, it may waive its jurisdiction and transfer a child to the district court for criminal proceedings. *Id.* § 54.02(a), (c).

The Texas Court of Criminal Appeals has stated as follows:

The transfer of a juvenile offender from juvenile court to criminal court for prosecution as an adult should be regarded as the exception, not the rule; the operative principle is that, whenever feasible, children and adolescents below a certain age should be 'protected and rehabilitated rather than subjected to the harshness of the criminal system.' Because the waiver of juvenile-court jurisdiction means the loss of that protected status, in *Kent v. United States*, the United States Supreme Court characterized the statutory transfer proceedings . . . as

9

'critically important,' and held that any statutory mechanism for waiving juvenile-court jurisdiction must at least 'measure up to the essentials of due process and fair treatment.'

*Moon v. State*, 451 S.W.3d 28, 36 (Tex. Crim. App. 2014) (quoting *Kent v. United States*, 383 U.S. 541, 560–62 (1966)).

The statutory requirements for waiver of jurisdiction and transfer are as follows:

(1) the child is alleged to have violated a penal law of the grade of felony;

(2) the child was:

(A) 14 years of age or older at the time he is alleged to have committed the offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; or

(B) 15 years of age or older at the time he is alleged to have committed the offense, if the offense is a felony of the second or third degree or a state jail felony, and no adjudication hearing has been conducted concerning that offense; and

(3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

Tex. Fam. Code Ann. § 54.02(a).

In making the determination required by section 54.02(a)(3), the juvenile court shall consider, among other matters, the following:

(1)    whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2)    the sophistication and maturity of the child;

(3)    the record and previous history of the child; and

(4)    the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

Tex. Fam. Code Ann. § 54.02(f). Any combination of these criteria may suffice to support a waiver of jurisdiction; not every criterion need weigh in favor of transfer. *Moon*, 451 S.W.3d at 47 & n.78. "The trial court is bound only to consider these . . . factors in deciding whether to waive jurisdiction. The court need not find that each factor is established by the evidence." *In re D.L.N.*, 930 S.W.2d 253, 258 (Tex. App.—Houston [14th Dist.] 1996, no writ).

If the juvenile court decides to waive jurisdiction, it must make findings of fact and specify its reasons for waiver in a written order. *See* Tex. Fam. Code Ann. § 54.02(h). The trial court must "show its work." *Moon*, 451 S.W.3d at 49.

### B.    Appellate Review

Our review of a transfer order is two-pronged. First, we review the juvenile court's specific findings of fact concerning the section 54.02(f) factors under a "traditional sufficiency of the evidence review." *Id.* at 47. Under a legal sufficiency challenge, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *Moon v. State*, 410 S.W.3d 366, 371 (Tex. App.—Houston [1st Dist.] 2013), *aff'd*, 451 S.W.3d 28 (Tex. Crim. App. 2014). If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. *Moon*, 410 S.W.3d at 371.

Under a factual sufficiency challenge, we consider all the evidence presented to determine if the court's findings are against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. *Id.*

Second, we review the juvenile court's waiver decision for an abuse of discretion. *Moon*, 451 S.W.3d at 47. That is, in reviewing the juvenile court's conclusion that the seriousness of the offense alleged and/or the background of the juvenile calls for criminal proceedings for the welfare of the community, we ask, in light of our own analysis of the sufficiency of the evidence to support the section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. *Id.* A juvenile court abuses its discretion when its decision to transfer is essentially arbitrary, given the evidence upon which it was based. *Id.* By contrast, a waiver decision representing "a reasonably principled application of the legislative criteria" generally will pass muster under this standard of review. *Id.* at 49. "[A] juvenile court that shows its work should rarely be reversed." *Id.*

ANALYSIS

## I.   Probable Cause

In his first issue, appellant contends the record does not support a finding of probable cause to believe he committed the alleged offense because there is no evidence Nicole's unborn child died as a result of appellant's actions. *See* Tex. Fam. Code Ann. § 54.02(a)(3).

### A.   Review of Probable Cause Determination

"Probable cause" is defined as sufficient facts and circumstances to warrant a prudent person to believe the suspect committed or was committing the offense. *D.L.N.*, 930 S.W.2d at 256. The probable cause standard embraces a practical,

common sense approach rather than the more technical standards applied when assessing whether proof rises to standards such as beyond a reasonable doubt or preponderance of the evidence. *Id.*; *In re J.G.*, 495 S.W.3d 354, 373–74 (Tex. App.—Houston [1st Dist.] 2016, pet. filed) (finding probable cause that juvenile who was a party to the offense committed murder).

Probable cause is based on probabilities; it requires more than mere suspicion but less evidence than that needed to support a conviction or support a finding by a preponderance of the evidence. *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997).

## B.    Application

Appellant is charged with capital murder based on the murder of more than one person during the same criminal transaction. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A). "Person" is defined as an individual, corporation, or association. *Id.* § 1.07(38) (Vernon Supp. 2016). "Individual" means "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." *Id.* § 1.07(26).

Appellant asserts there is no probable cause to believe he committed capital murder because there is no evidence the unborn child did not die of other causes before Nicole died. He contends the unborn child could have died as a result of the tri-vessel cord around its neck or Nicole's drug abuse.

This contention fails because there is evidence supporting the trial court's determination of probable cause. Appellant told police that Nicole said she could not afford an abortion. This statement supports a probable cause finding because Nicole's contemplation of an abortion indicates she had a viable pregnancy that would have continued to term if she had not been killed. Proof beyond a reasonable doubt is not required to find probable cause. Probable cause is based on "factual

and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Guzman*, 955 S.W.3d at 87. A reasonable, prudent person could assume Nicole's unborn child was alive until Nicole was murdered.

In any event, the record supports the trial court's finding of probable cause even without appellant's statement regarding Nicole's contemplation of obtaining an abortion. There is no dispute that: (1) appellant strangled Nicole by wrapping an electrical cord around her neck, and (2) Nicole's cause of death, according to the medical examiner, was strangulation. Lay people understand maternal death can cause fetal death. *Cf. Eguia v. State*, 288 S.W.3d 1, 9–10 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (evidence showed cause of unborn child's death was caused by death of mother). It is reasonable to believe, at this early stage of the case, that appellant caused Nicole's death, which, in turn, caused the unborn child's death. *See Guzman*, 955 S.W.3d at 87.

After considering the totality of the circumstances, we conclude the record contains information sufficient to warrant a reasonable person to believe appellant caused the death of his mother and his unborn sibling. We overrule appellant's first issue.

## II.   Section 54.02(f) Factors

Appellant's second issue concerns the trial court's findings regarding the four factors in section 52.04(f). He contends the trial court abused its discretion in waiving its exclusive juvenile jurisdiction and transferring the case to district court based on those findings. That contention invokes the second part of our review under *Moon*, in which we ask, "in light of [our] own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or

principles." *Moon*, 451 S.W.3d at 47. Accordingly, even though appellant does not explicitly challenge the sufficiency of the evidence to support any 52.04(f) finding by the trial court, we will conduct our own sufficiency analysis as part of our determination of whether the trial court abused its discretion. *Id.*

Appellant asserts the trial court abused its discretion by failing to consider all of the required factors under section 54.02(f) before finding that, because of the seriousness of the offense alleged or appellant's background, the welfare of the community requires criminal proceedings. *See* Tex. Fam. Code Ann. § 54.02(a)(3). Those factors are as follows: (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (2) the sophistication and maturity of the child; (3) the record and previous history of the child; and (4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court. *Id.* § 54.02(f).

### A. Evidence Addressing the 54.02(f) factors

Evidence addressing the section 54.02(f) factors came from two psychologists who evaluated appellant: Jenine Collins Boyd, Ph.D., appointed by the trial court, and Bryan Sweeney, Ph.D., retained by appellant. Neither party challenges the qualifications of Dr. Boyd or Dr. Sweeney.

### 1. Dr. Boyd

Dr. Boyd met with appellant twice while appellant was detained in a juvenile facility. Appellant was 15 years old by that time. Dr. Boyd administered three tests—one each for intelligence, achievement, and personality—and interviewed appellant. Appellant's lawyer was present when Dr. Boyd interviewed appellant and appellant's father. Her written report regarding her evaluation was admitted

into evidence at the transfer hearing without objection. She also testified at the transfer hearing.

Dr. Boyd described appellant as respectful and cooperative during their visits. He exhibited no unusual mood changes. She observed no overt signs of delusion, auditory or visual hallucinations, or a thought disorder, and appellant denied a history of delusions or hallucinations. His father described him as intelligent, kind, calm, and polite.

Appellant recounted his unstable childhood for Dr. Boyd. He lived with his mother until he was four years old, but then the Department of Family and Protective Services ("the Department") removed him from her care and placed him in foster care. Dr. Boyd did not know but assumed the removal was due to Nicole's alleged abuse or neglect of appellant. Appellant believed his father reported his mother to the Department, which made appellant angry with his father.

Appellant lived with his maternal grandparents from age six to eight. He told Dr. Boyd they left him in a camper during a fire while they called 911, which made him feel abandoned, and he did not want to see them again. He was returned to Nicole briefly, but the Department removed him again when he was nine years old. Dr. Boyd had no Department records to review.

Appellant lived with his father and his two paternal half-sisters beginning in March 2010. Appellant's half-sisters moved out in June 2013, and appellant was left alone with his father. A year later his father went to jail; the reason for his father's incarceration is not clear from the record.

Appellant lived with his paternal grandparents for six months after his father went to jail. During that time, appellant said, he repeatedly called his mother and

asked to live with her. His grandparents did not agree, but they finally allowed him to move in with Nicole in December 2014.

Nicole was hospitalized due to seizures in February 2015, so appellant stayed with Nicole's friend, Opal. While at Opal's house, appellant mutilated his arms. His mother was out of the hospital by this time but apparently was "unavailable," so Opal called the police. The police were set to return appellant to his father's care, but appellant wanted nothing to do with his father, so he ran away and lived with friends. The police eventually located appellant and returned him to his mother's home. Appellant told Dr. Boyd he did not want to be around Nicole's boyfriend, so he moved into a motel for two weeks. He experienced suicidal ideation at the motel. He felt "down and depressed," and he put a gun to his head but "couldn't pull the trigger."

Appellant first drank alcohol at age 12 at a party with his mother. He first smoked marijuana when he was 12 years old as well, this time with his father. He smoked marijuana daily during the three years he lived with his father. Appellant occasionally participated in Native American sweat lodges with his aunt. Peyote was present in the sweat lodges, but Dr. Boyd did not know if appellant ingested it.

Appellant knew his mother was a dancer at a strip club and that she continually abused drugs. She had financial difficulties throughout appellant's life; at times there was little to no food in the house, and they were evicted at least once.

Dr. Boyd did not have access to all of appellant's school records, but no significant deficits were noted on the records she did review. Appellant told her he had been suspended from school more than once for drug use and fighting. Two weeks before Nicole's death, appellant was suspended for five days for smoking marijuana in a school bathroom. He was referred to an alternative high school as a result.

Dr. Boyd found appellant to possess average intellectual potential and excellent computational math skills. He read and spelled at an eighth- and ninth-grade level, respectively. His math-computation ability was higher than a twelfth-grade level.

Appellant's responses on the personality test were inconsistent and therefore considered invalid. His father's responses on the parent version of that test were considered valid and showed "an elevation" on a scale measuring conduct problems. Conduct noted by appellant's father included using foul language, stealing, sneaking around, smoking or chewing tobacco, lying, using illegal drugs, deceiving others, and breaking rules to see what will happen. Dr. Boyd said some of that behavior is typical of teenagers and some is considered delinquent.

After completing her evaluation, Dr. Boyd concluded appellant is similar to other 15-year-old children in his sophistication and maturity and does not possess any intellectual deficits or naiveté compared to his peers. He can make good decisions when he so desires. Her diagnostic impressions were conduct disorder, cannabis abuse, neglect of a child (victim), and physical abuse of a child (victim).

Dr. Boyd recommended that appellant receive rehabilitative services in a secure facility where his educational and counseling needs can be met. She said he needs behavior modification, resocialization, substance abuse services, and empathy training. Additionally, appellant's mental status should be monitored due to the seriousness of the charge against him, his previous self-mutilation, and his previous thoughts of suicide. In her opinion, because appellant was already 15 years old, the juvenile system would not have time to provide him sufficient services before he aged out of the system. She found no contraindications to appellant's being in the custody of the Texas Department of Criminal Justice if he is certified as an adult. On cross-examination at the transfer hearing, Dr. Boyd

agreed there were no contraindications to appellant's being retained in the juvenile system and sentenced under the determinate sentencing statute, which permits sentences up to 40 years in certain situations. *See* Tex. Fam. Code Ann. § 53.045 (Vernon Supp. 2016), § 54.04011 (Vernon 2014).

## 2. Dr. Sweeney

Dr. Sweeney spent seven to eight hours interviewing and administering psychological tests to appellant. Dr. Sweeney has treated juveniles who have been convicted, but he has not worked for the juvenile justice system. His knowledge of the juvenile system comes from governmental reports, articles, and conversations with people. Before he met with appellant, he never performed a psychological evaluation on a juvenile as part of a certification proceeding.

Dr. Sweeney reviewed the raw data underlying Dr. Boyd's evaluation. He did not prepare a report, but he testified at the transfer hearing. He conducted his own evaluation "just to be safe" because he had the benefit of information Dr. Boyd did not have: appellant's Department records. He also added three tests. Dr. Sweeney had "no major disagreement" with Dr. Boyd's conclusions, but he had reservations about her diagnosis of conduct disorder:

> I don't know that I disagree with it, but I'm not sure that [appellant] meets the criteria for conduct disorder. He hasn't had a history of problematic behavior. He hasn't — he hasn't had run-ins with authority throughout his life. He wasn't a fire starter. He's not somebody that abused animals.

Dr. Sweeney characterized appellant's childhood as "incredibly unstable." He spoke of the "volatile" relationship between Nicole and appellant, explaining, "[H]e didn't want anything more than for her to love him. So, he kind of put her on a pedestal, but had major resentments of her at the same time."

19

Appellant is of average intelligence, in Dr. Sweeney's opinion, and has no intellectual deficits. He may be more mature than other 15-year-old children in that early on he had to fend for himself, find money to feed himself, and take care of his mother, who was frequently incoherent. However, he is emotionally less mature than his peers because "he didn't have the same sense of security and the same bonding" growing up.

Dr. Sweeney found no contraindications to appellant's remaining in the juvenile system. He believed the juvenile services available would meet appellant's needs.

### B.     Review

In reviewing a trial court's transfer and waiver of jurisdiction for an abuse of discretion, we must decide whether the trial court acted without reference to guiding rules or principles. We assess whether the decision was "essentially arbitrary," given the evidence upon which it was based, or whether it "represented a reasonably principled application of the legislative criteria." *Moon*, 451 S.W.3d at 47.

We begin by reviewing the sufficiency of the evidence to support the trial court's findings on the section 54.02(f) factors. *Id.* A legal sufficiency analysis requires us to credit only that evidence favorable to the finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *Moon*, 410 S.W.3d at 371. If more than a scintilla of evidence favors the finding, the evidence is legally sufficient to support that finding. *Id.* A factual sufficiency analysis is based on all the evidence. *Id.* A finding is supported by factually sufficient evidence unless the finding is against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. *Id.*

Not every factor in section 54.02(f) need weigh in favor of transfer. Any combination of the criteria may suffice to support the juvenile court's waiver of jurisdiction. *Id.* at 47 & n.78; *accord D.L.N.*, 930 S.W.2d at 258 ("The court need not find that each factor is established by the evidence.").

The trial court concluded that all of the section 52.04(f) factors weigh in favor of transfer. The court's order includes the following determinations:

- "[B]ecause of the seriousness of the offense or the background of the child, the welfare of the community requires criminal proceedings."

- "[T]he penal laws alleged to have [been] violated by the [appellant] . . . were laws of the grade of Captial Felony and were offenses against a person."

- "[B]ased on the evidence and testimony presented at the hearing the Court finds . . . the alleged offense particularly egregious and aggravating . . . ."

- Appellant "is of sufficient sophistication and maturity to have intelligently, knowingly and voluntarily waived all constitutional and statutory rights heretofore waived . . . and is of sufficient sophistication and maturity to intelligently and knowingly understand and have a rational as well as a factual understanding of the proceedings in this Court and to rationally assist in his own defense . . . ."

- Appellant "has sufficient sophistication and . . . sufficient present ability to aid and assist his attorney."

- "[T]here is little, if any, likelihood that the facilities and services available to this Court could reasonably be expected to rehabilitate the [appellant] . . . and . . . there is from the nature of the offense, the likelihood that the public is not adequately protected from future such conduct . . . ."

Based upon these findings, the trial court determined that "the jurisdiction of this Court is waived in this cause."

## 1. Sufficiency of the evidence

### a. Offense against person or property

Appellant is accused of an offense against the person. By statute, offenses against the person are afforded greater weight in favor of transfer. Tex. Fam. Code Ann. § 54.02(f)(1).

The trial court's order details the nature and circumstances of Nicole's death. It noted the electrical cord around her neck, the large number of stab wounds on her body, and the significant amount of blood near the body. Those findings are supported by the autopsy report, crime scene photographs, and police officers' testimony. The court also cited evidence from Beth's and Trace's recorded statements to police that appellant threatened, at least twice, to kill his mother and the baby.

The trial court's findings concerning the first factor are amply supported by the record, and there is no evidence in the record to the contrary. Accordingly, the findings are supported by legally and factually sufficient evidence.

### b. Sophistication and maturity of appellant

The trial court's order expressly relies on Dr. Boyd's written report in making a finding about appellant's sophistication and maturity. Specifically, the court focused on Dr. Boyd's findings that appellant has no intellectual deficits or naiveté compared to children his age, shows no signs of a thought disorder, and has no history of inpatient or outpatient psychiatric services. The trial court noted that Dr. Sweeney had no major disagreements with Dr. Boyd's opinions other than the diagnosis of conduct disorder.

Appellant admits he has no history of psychiatric services but contends Dr. Boyd's statement to that effect is misleading because she knew appellant thought

of and took steps toward suicide a few months before the offense. The focus on appeal is whether the trial court's decision was arbitrary and unprincipled. *Moon*, 451 S.W.3d at 47. We cannot say the trial court acted without reference to guiding rules or principles by relying on an admitted fact. *See In re B.R.H.*, 426 S.W.3d 163, 168 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("[W]e defer to the trial court's findings unless the record contains no evidence to support them.").

The trial court also recounted appellant's difficult upbringing, highlighting "his mother's alleged abuse of him as a child that led to him being placed in [Department] custody and the general instability of his home life which included drug use by both parents." The trial court then referred to Dr. Boyd's opinion that appellant's home situation did not affect his cognitive abilities.

Appellant's real challenge appears to be his assertion that Dr. Boyd's opinion is unreliable because she did not review appellant's Department records. Appellant suggests on appeal that Dr. Boyd's opinion would have been different had she reviewed these records.

This contention fails because Dr. Boyd assumed, even without the records, that Nicole abused and neglected appellant. She diagnosed him as the victim of both physical abuse and neglect. There is no indication that the Department records would have materially changed Dr. Boyd's opinions given that Dr. Boyd assumed the facts appellant says the records show.

In any event, appellant's retained expert, Dr. Sweeney, did review the Department records. Dr. Sweeney expressed no disagreement with respect to Dr. Boyd's discussion of appellant's background or Dr. Boyd's opinion that appellant's troubled upbringing did not affect his cognitive abilities. Rather, Dr. Sweeney said even after he reviewed the Department records, "the findings were not different" than those of Dr. Boyd.

The trial court quoted Dr. Boyd's testimony that appellant is able to make good decisions when he so chooses. Her statement "[led] the Court to believe that [appellant] knows right from wrong but has in the past chosen not to make good decisions, and specifically in this case, made decisions that led to the violent death of his mother and unborn sibling." Dr. Boyd's testimony is more than a scintilla of evidence, and therefore legally sufficient, to support the trial court's findings on the second factor. *Moon*, 410 S.W.3d at 371.

Appellant contends on appeal that Dr. Sweeney said appellant "does not have the present emotional ability to make good decisions" due to his background. No such testimony appears in the record. Even if it did, that testimony would reflect a second expert's opinion; the trial court would be free to believe or disbelieve such testimony. *See id.* at 375 ("[A]s the sole judge of credibility, the juvenile court was entitled to disbelieve [expert] testimony . . . ."). Dr. Sweeney's hypothetical testimony would not render the trial court's finding to the contrary "against the great weight and preponderance of the evidence so as to be clearly wrong or unjust." *Id.* at 371. The evidence is legally and factually sufficient to support the trial court's findings regarding the second factor.

### c. Appellant's record and history

Appellant asserts the trial court failed to consider appellant's record and history. We disagree. The trial court expressly considered Dr. Boyd's recitation and opinions about the facts of appellant's childhood, including information provided to Dr. Boyd by appellant's father indicating appellant has a history of deceitfulness, stealing, and disruptive behavior.

Dr. Boyd's report discusses appellant's self-proclaimed membership in a gang. Appellant told Dr. Boyd he has been "blessed in" to a gang because his older cousin is a member. He reported he was "jumped in" to a gang in January 2015.

Dr. Boyd also detailed appellant's school disciplinary history based on her review of school records and appellant's statements to her. Appellant was suspended for five days shortly before Nicole died because he smoked marijuana in a school restroom. Appellant reported a history of suspension due to fighting.

Beth told police that appellant said he was in two gangs and had killed a person. She did not believe him. Beth also stated appellant frequently spoke of killing his father because he hated him.

The trial court's findings regarding appellant's background are supported by Dr. Boyd's report and Beth's recorded statement. Accordingly, the findings are supported by legally sufficient evidence. Further, because there is no evidence to the contrary, the findings are supported by factually sufficient evidence as well.

### d.    Protection of public and likelihood of rehabilitation

Both Dr. Boyd and Dr. Sweeney testified about the availability of rehabilitative services in the juvenile system. Dr. Boyd opined that appellant needed more than the juvenile system could offer in the relatively short period appellant would be in that system. Dr. Sweeney testified that the juvenile system could adequately meet appellant's needs. As the sole judge of credibility, the trial court was free to decide which opinion to adopt or reject. *See Moon*, 410 S.W.3d at 375.

Dr. Boyd's testimony is more than a scintilla of evidence supporting the trial court's findings that "the public is not adequately protected from future conduct" by appellant and there is "little, if any, likelihood that the facilities and services available to this Court could reasonably be expected to rehabilitate [appellant]." Those findings, accordingly, are supported by legally sufficient evidence.

Even if Dr. Sweeney's contrary testimony would support a decision not to waive jurisdiction, we cannot say his testimony is enough to render the trial court's finding against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. Therefore, the trial court's findings on the fourth factor are supported by factually sufficient evidence.

Appellant further contends the State failed to prove that the determinate-sentencing option for juvenile proceedings, codified in section 54.04 of the Family Code, would be inadequate to ensure the welfare of the community. That statute permits a judge or jury in certain cases to sentence a juvenile to a term of confinement that exceeds the length of time the individual is eligible to spend in the juvenile justice department. Such a sentence is served in the juvenile justice department or other authorized facility with a possible transfer to the Texas Department of Criminal Justice. *See* Tex. Fam. Code Ann. § 54.04(d)(3) (Vernon Supp. 2016). Assuming other requirements are met, a juvenile who committed capital murder may be sentenced to up to 40 years. *Id.* §§ 53.045(a)(2), 54.04(d)(3)(A).

Section 54.02(f)(4) refers to "the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court." Tex. Fam. Code Ann. § 54.02(f)(4). Dr. Boyd opined there would not be enough time for the juvenile system to provide appellant with sufficient services before appellant aged out of the system at 19. Dr. Sweeney disagreed; he believed the juvenile system could adequately meet appellant's needs by the time appellant turned 19. As the sole judge of credibility, the trial court was free to credit Dr. Boyd's opinion over Dr. Sweeney's. *See Moon*, 410 S.W.3d at 375.

The conclusion does not change even if we presume the determinate sentencing option may be considered as part of "the prospects of adequate protection of the public." Dr. Boyd testified that adult sentencing was "not contraindicated" and determinate sentencing also was "not contraindicated." Dr. Sweeney did not assert a conclusion on this point with respect to either adult sentencing or determinate sentencing. The trial court was entitled to rely on Dr. Boyd's conclusion that sentencing appellant as an adult if he is found guilty was not contraindicated. *See id.*

### 2. Decision to transfer

We have concluded that each of the trial court's findings is supported by legally and factually sufficient evidence. In light of that conclusion, we now consider whether the trial court's decision to waive jurisdiction and transfer the case was "essentially arbitrary" and "without reference to guiding rules or principles." *Moon*, 451 S.W.3d at 47.

The record reflects the trial court carefully considered this matter. The evidentiary hearing spanned four days. Crime scene photographs, police officers' testimony, and the autopsy report all revealed that Nicole suffered a violent death. Two psychologists testified, offering their opinions based on the same facts. The trial court received evidence regarding appellant's unstable childhood and heard argument from appellant's counsel. The transfer order includes the findings specified under section 54.02, and each of those findings is sufficiently supported by the evidence. All of the trial court's findings support a decision to transfer jurisdiction.

On this record and in light of these findings, we cannot say the trial court's decision was arbitrary or made without reference to guiding rules. Rather, the trial court's decision resulted from a principled application of legislative criteria. *Id.*

Accordingly, we find no abuse of discretion in the trial court's decision to waive jurisdiction and transfer appellant to district court. We overrule appellant's second issue.

## CONCLUSION

We affirm the trial court's order waiving juvenile jurisdiction and transferring appellant to criminal district court.

/s/    William J. Boyce
          Justice

Panel consists of Chief Justice Frost and Justices Boyce and Christopher.