**Opinion issued December 4, 2018**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-18-00778-CV**

_____

**IN THE MATTER OF K.T.S.**

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-02717J**

---

**MEMORANDUM OPINION**

In May 2017, the State filed a petition against 18-year-old Appellant in juvenile court, alleging that he engaged in delinquent conduct by committing capital murder in June 2015 when he was 16 years old. Because Appellant was over the age of 18 when charged, the State petitioned the juvenile court to waive its jurisdiction and transfer the case to district court for criminal proceedings.

Following a certification hearing, the juvenile court signed an order granting the State's motion to transfer.

Appellant brings this accelerated appeal to challenge the juvenile court's order.[1]  In one issue, Appellant contends that the juvenile court abused its discretion by waiving its jurisdiction and transferring him to criminal court because "the State failed to prove by a preponderance of the evidence that it was beyond [its] control . . . to proceed to certification before Appellant's 18th birthday."  He also generally contends that the State did not exercise due diligence in filing the petition in juvenile court before Appellant turned 18.

Because we conclude that the juvenile court did not abuse its discretion, we affirm the order.

## Background

On June 17, 2015, A.V. and his friend, Aaron Wilson, went to a Houston apartment complex to sell seven grams of marijuana to someone they knew as "Jay."  A.V. had sold marijuana to Jay two or three other times in face-to-face transactions.  To set up the drug deal, A.V. communicated with Jay on the telephone.  Jay selected the apartment complex as the location for the transaction.

Entrance into the complex required a gate code, which Jay provided to A.V. over the telephone.  Using the code, A.V. and Wilson entered the apartment

---

[1]     *See* TEX. FAM. CODE § 56.01(c)(1)(A).

complex. Wilson was driving and A.V. was in the passenger's seat. Jay instructed A.V. to go to the back of the apartment complex and wait for him near a dumpster. A.V. and Wilson followed Jay's instructions, parking next to the dumpster and waiting in the car.

A.V. then saw Jay, whom he recognized from past drug transactions, walking toward the car. Wilson was sitting on the driver's side sending messages on his phone to his girlfriend. When Jay got to the car, A.V. showed him the seven grams of marijuana. The price of the marijuana was $90, and Jay asked A.V. if he had change for a $100 bill. As A.V. looked to see if he had change, Jay grabbed the marijuana, and two men came out from behind the dumpster; one of them had a gun. A.V. then realized that it was a setup for a robbery. Wilson pressed the car's accelerator to get away. As the car sped away, A.V. heard a gunshot, and the car crashed. Wilson had been hit in the head by a bullet and died from the injury.

Fearing for his life, A.V. ran from the scene. He then realized that the police would soon arrive, and he returned. A.V. waited at the scene and told the police what had happened. A.V. provided police with Jay's cell phone number, which had an 832 area code. A.V. also provided police with the gate code Jay had given him.

Detective Sergeant H. Garcia and Detective Sergeant S. Murdock of the Houston Police Department's Homicide Division were assigned to investigate the

3

case. They researched the name "Jay" and developed a suspect, J.G. The day after Wilson was killed, the detectives showed A.V. a photo spread with J.G.'s picture in it. A.V. said that the person he knew as Jay was not in the pictures.

The detectives learned that the gate code given to A.V. by Jay was the code used by residents who live in Building 14. They also learned that the 832-phone number used by Jay belonged to a woman whose brother, C.H., lived in Building 14.

The detectives spoke with C.H. He permitted police to enter the 832 number into his phone. The phone showed that the contact associated with the number was Appellant, who is C.H.'s brother. C.H. told police that Appellant had not been to his apartment on the night of the shooting.

With his mother present, 16-year-old Appellant voluntarily gave a statement to the police. He admitted that he was at his brother's apartment complex when the shooting occurred. He said that he had played basketball with someone named Jay that day. Appellant claimed that Jay had asked him for a ride to the apartment complex where Appellant's brother lives.

Appellant claimed that Jay had borrowed his cell phone for about two hours and used it to text. Appellant also said that Jay had then erased all the text messages from the phone. Appellant said that, when they arrived at the complex, Jay already knew the gate code used for Building 14. Appellant told the police that

4

he had dropped Jay off inside the apartment complex and, then, a short time later, he heard gunshots. Appellant said he went to his brother's apartment and came out to see the police and fire department when they arrived. Appellant denied that he was "Jay" and told the detectives that he had nothing to do with the shooting.

Appellant's mother signed a consent form, allowing police to search Appellant's cell phone. The search revealed only two text messages between Appellant's phone and A.V.'s phone. The subject matter of the texts appeared to relate to a drug transaction.

After Appellant spoke with police, Appellant's brother, C.H., admitted that Appellant had been at his apartment on the night of the shooting, saying that he had forgotten that Appellant was there. Detective Murdock also spoke with C.H.'s roommate. The roommate recalled that he had heard gunshots, tires squealing, and a car crash. Then, Appellant and his cousin had come running up the stairs to the apartment. They were upset and wanted to get inside the apartment. The roommate told Detective Murdock that Appellant had said that "somebody had just been shot."

To identify Jay, Detective Murdock showed A.V. another photo spread on July 1, 2015. The photo spread included Appellant's picture along with pictures of five other similar-looking males. Appellant's photo was in the first position. Detective Murdock noticed that A.V. stared at Appellant's picture for over one

5

minute. However, A.V. did not choose Appellant's picture; instead, A.V. said that the person in the second photo "kind of" looked like Jay and indicated that the person in the fourth photo "really look[ed]" like Jay. Detective Murdock later testified that he could not question A.V. about his negative identification of Appellant, even though the detective believed that A.V. recognized Appellant, because that could taint the identification process.

The police also obtained a warrant to search the phone records for Appellant's and A.V.'s cell phones. The police received the phone records on September 1, 2015. The records showed that from 11:10 p.m. until 11:53 p.m. there were 32 contacts between the phones, including five phone calls and 27 text messages.[2]

The police learned of no additional evidence in 2015 or 2016. Appellant turned 18 on November 9, 2016.

On January 5, 2017, Wilson's mother, C. Baird, contacted Detective Garcia to inform him that she had spoken with A.V. A.V. told her that he had recognized the person he knew as Jay in a photo spread shown to him by police. He said that he had not identified Jay in the photo spread because he feared retaliation. Baird

---

[2]     Detective Murdock testified at the certification hearing that the contacts occurred over an hour-and-one-half period but the phone records, admitted into evidence, show that the first call was at "23:10" and the last was at "23:53."

6

said that she had implored A.V. to be honest with the police about the identification, and he had agreed to be truthful about Jay's identity.

Between January and May 2017, Detective Murdock attempted to contact A.V. numerous times and left messages for him. On May 8, 2017, the detectives met with A.V. and showed him the photo spread with Appellant's picture and five others. A.V. looked at the photos and immediately identified Appellant as being the person he knew as Jay. He circled Appellant's photo and initialed it. A.V. told the detectives that he had not identified Appellant when shown the photo spread in 2015 because he was scared and feared retaliation. He said, "I didn't want to get shot like my friend."

Once A.V. positively identified Appellant as Jay, the detectives presented the facts to the juvenile division chief of the district attorney's office. On May 15, 2017, the juvenile division chief filed a petition in Harris County juvenile court, alleging that Appellant, at age 16, engaged in delinquent conduct by committing capital murder in June 2015. The State requested the juvenile court to "consider discretionary transfer to Criminal Court, and [to] waive[] its exclusive original jurisdiction and transfer [Appellant] to the appropriate . . . Criminal District Court for criminal proceedings."

Appellant moved to dismiss the State's petition on the basis that the State had not used due diligence in proceeding against Appellant in juvenile court before

7

he turned 18. The juvenile court conducted an evidentiary hearing in January 2018 to consider (1) Appellant's motion to dismiss and (2) concomitantly the State's request that the juvenile court waive its jurisdiction and transfer Appellant to criminal district court for prosecution.

At the hearing, the State offered the testimony of Detectives Garcia and Murdock. They testified about their investigation of Wilson's murder to show the State had exercised due diligence in the manner they handled the investigation before Appellant turned 18. Their testimony described the steps taken in the investigation, what information the detectives learned during the investigation, and when they learned it.

The detectives' testimony indicated that, while the circumstantial evidence discovered before Appellant turned 18 supported their belief that Appellant was Jay, A.V.'s negative identification of Appellant in July 2015 undermined their case against Appellant. A.V. told them that he knew Jay by sight because he had engaged in previous face-to-face drug transactions with him. A.V.'s negative identification of Appellant served to support Appellant's story that he had loaned his phone to someone named Jay on the night of the shooting. The detectives indicated that, under the circumstances of this case, they did not have probable cause to proceed against Appellant because of A.V.'s negative identification of Appellant as Jay.

8

When asked "[h]ow harmful is it to a case of circumstantial evidence when you have an eyewitness that's not willing to identify a suspect," Detective Murdoch answered, "Kills it." Detective Garcia testified, "Once the surviving complainant [A.V.] said, 'No, I don't recognize him,' it put our investigation in jeopardy. If he would've recognized him as Jay, then I would've presented the case to the ADA." He testified that the case was not presented to the district attorney's office to pursue charges against Appellant until A.V. had positively identified Appellant as Jay.

To show that the State had not acted with due diligence in proceeding against Appellant before he turned 18, Appellant offered the testimony of D. Webber, a private investigator and retired police officer. Webber testified that, before retirement, he had worked 11 years for the Cut-N-Shoot Police Department as a patrol officer and had worked 20 years for the Houston Police Department as a patrol officer, an officer in the narcotics unit, and "for a brief time worked with the Vice Division on several projects." To prepare for testifying, Webber said that he reviewed the reports regarding the police's investigation of the case.

Webber suggested that, besides the steps taken in the investigation, the homicide detectives should have taken additional steps to link Appellant to the crime scene. He indicated that the police should have tested the outside of Wilson's car for fingerprints. Webber said, "In my experience with a hand-to-hand

9

drug transaction from someone outside the car to inside the car, 99 percent of the time they lean into the car or they touch the car in some way." When asked by defense counsel whether the homicide detectives should have checked Appellant's clothes for gunshot residue, Webber stated, "[I]n my opinion it would have been something that would have been reasonable to check into."

Defense counsel elicited testimony from Webber about the circumstantial evidence discovered by the police, before Appellant turned 18, that linked Appellant to the murder. According to Webber, this included evidence that (1) Appellant and another person were seen immediately after the shooting with a gun and heard to say "someone was shot";[3] (2) cell phone records showing that A.V. communicated with a cell phone used by Appellant on the night of the murder; (3) the gate code given by Jay to A.V. was the code used by residents of Building 14 where Appellant's brother lived; and (4) A.V. stared at Appellant's photo in the 2015 photo spread before claiming that Jay was not there. The defense asked Webber, "Based on your review of this case do you believe in your opinion that the officers should have taken the case to the Harris County District Attorneys' Office Juvenile Division in September of 2015 after they got the phone records?" Webber

---

[3]    Other than the testimony of Webber, who did not have first-hand knowledge of the investigation, no other evidence was presented indicating that, after the shooting, Appellant and the person with him were seen with a gun. Detective Murdock testified that Appellant and his cousin were seen after the shooting in the apartment complex and appeared upset, but he did not testify that Appellant or his cousin had a gun.

10

responded affirmatively. However, Webber also testified that he had no experience with long-term investigations, had never met with a prosecutor to discuss probable cause in a murder case, and had "never investigated a homicide case."

The juvenile court denied Appellant's motion to dismiss the State's petition. In support of the denial, the trial court filed findings of fact and conclusions of law. Among the findings, the juvenile court found Detectives Garcia and Murdock to be "credible and reliable" witnesses. The court detailed the steps the detectives had taken in investigating the case and ultimately pursuing charges against Appellant. In its last finding of fact, the juvenile court found: "The State sought discretionary transfer in a timely fashion as soon as probable cause existed to believe [Appellant] committed the above capital murder, but that such probable cause did not develop until after [Appellant] turned 18 with the new evidence provided by [A.V.]."

Based on its findings, the juvenile court concluded:

2. Because probable cause did not exist in this case before [Appellant] turned 18 years of age on November 9, 2016; and, because any indications or suspicion that [Appellant] committed the capital murder which police knew existed before that [Appellant] turned 18 was defeated by [A.V.'s] negative identification of [Appellant] in the photo spread, this Court concludes that the State did not possess probable cause to charge [Appellant] by petition with this capital murder any time before May 8, 2017, when police learned in newly developed evidence that [Appellant] was in fact the person [A.V.] knew as "Jay." [citation omitted.]

11

3.    Because the investigation proceeded in a timely fashion before [Appellant's] 18th birthday; and because, but for the fact that probable cause did not develop until May 8, 2017 (a date after [Appellant's] 18th birthday), the court finds by a preponderance of the evidence that the State exercised due diligence to pursue the certification petition under Tex. Fam. Code Ann. §54.02(j), but that for a reason beyond the control of the State, it was not practicable to proceed in juvenile court by petition before [Appellant's] 18th birthday.

4.    The Court concludes that until police obtained the new evidence after [Appellant's] 18th birthday that resulted from [A.V.'s] positive identification of [Appellant] as the person he knew as Jay" and as the person that met with [A.V.] and the complainant on the night of the shooting, the police had no direct evidence that connected [Appellant] as the person who set up the drug deal and met in the parking lot with [A.V.] or as the person who set up the robbery.

On March 20, 2018, the juvenile court conducted a certification hearing on the State's request to waive its jurisdiction and to transfer Appellant to criminal district court. The State reoffered all the evidence from the January 2018 hearing on Appellant's motion to dismiss the petition, and the juvenile court took judicial notice of its file, including its findings of fact and conclusions of law supporting its denial of Appellant's motion to dismiss.

On March 27, 2018, the juvenile court signed an order waiving jurisdiction and transferring Appellant to criminal district court for prosecution. In its order, the juvenile court made findings to support of waiver and transfer. *See* TEX. FAM. CODE § 54.02(h). Relevant to the issue raised on appeal, the court found as follows:

12

The Court finds the following facts support waiver of exclusive original jurisdiction and transfer of [Appellant] to criminal district court for criminal proceedings:

. . . .

(5) That by a preponderance of the evidence after due diligence of the State it was not practicable to proceed in juvenile court before the 18th birthday of [Appellant] because the State did not have probable cause to proceed on the capital murder charge in 2015 or 2016. Instead, new evidence developed after [Appellant]'s 18th birthday. The following facts demonstrate when and how the new evidence developed that led to probable cause:

a. The Court incorporates by reference the Findings of Fact and Conclusions of Law issued on March 19, 2018 in response to [Appellant]'s Motion to Dismiss as factual and legal support for this Court's decision to waive jurisdiction and transfer the matter to criminal district court. . . .

b. The Court finds that after due diligence of the State it was not practicable to proceed in juvenile court before [Appellant's] 18th birthday because:

i. On July 1, 2015, [Detective] Murdock showed [A.V.] a photo spread of [Appellant] and five other males with similar physical characteristics. [Detective] Murdock testified that [Appellant] was located in position number one of the photo spread shown to [A.V.]. [Detective] Murdock stated that [A.V.] stared at picture number 1 for a minute and then stated it could be number 2 or number 4. [A.V.] made a negative identification of [Appellant].

ii. [Detective] Murdock testified that it would have been impermissibly suggestive to challenge [A.V.] on the fact that he did not make an identification on the first picture, or to suggest that picture number one was a person present at the complex that night, even though [Detective] Murdock believed [A.V.] recognized the person in position number one.

13

iii. [Detective] Murdock could not suggest to a witness which photograph he should have identified without tainting any further investigation.

iv. [A.V.] was the only eyewitness to the capital murder, and the only direct evidence of Jay's involvement and of Jay's identity.

v. [A.V.'s] identification of the three men involved in the capital murder was the only evidence known or available to police that could have refuted [Appellant's] claims to being present at the complex, but uninvolved in the shooting.

vi. The cell phone records alone linking [Appellant] and [A.V.] to communications near the time of the murder did not overcome [Appellant]'s statement to police. [Appellant] told police that he allowed Jay [to] use his phone. [A.V.] told police he had met Jay multiple times and he would recognize Jay if he saw him again. [A.V.]'s negative identification of [Appellant]'s photograph as the person he recognized and knew as Jay confirmed [Appellant]'s statement that someone else was Jay, not [Appellant].

vii. [Detective] Murdock testified that after September 1, 2015, the case remained open pending new information because the negative identification from witness [A.V.] defeated any circumstantial evidence that might have shown contact between [Appellant] and the complainant near the time of the complainant's death.

viii. On November 9, 2016, [Appellant] turned eighteen years old.

ix. Probable cause linking [Appellant] to the murder did not develop until police learned that [A.V.] had lied to police during the photospread identification based on his fears of retaliation.

x. On January 5, 2017, police first learned from [C.] Baird, the complainant's mother, about [A.V.'s] deliberate misidentification of Jay in the photo spread.

14

xi. During the conversation with Mrs. Baird, [A.V.] told her that he was now willing to be honest with investigators regarding Jay's identity.

xii. On May 8, 2017, [Detective] Murdock met with [A.V.] and again presented him with the photo spread of [Appellant] and five other males with similar physical characteristics originally shown to [A.V.] on July 1, 2015. Neither [Detective] Murdock nor [Detective] Garcia had told [A.V.] that he had or had not picked the correct person from the photospread in the past. [Detective] Murdock stated that [A.V.] looked at the photo spread and immediately identified [Appellant] in position number one as Jay.

xiii. [A.V.] admitted to [Detective] Murdock that he did not originally identify [Appellant] in 2015 because he felt scared.

xiv. Probable cause did not exist in this case before [Appellant] turned 18 years of age on November 9, 2016 because any indications or suspicion that [Appellant] participated in the capital murder, about which police knew before that [Appellant] turned 18, was defeated by [A.V.'s] negative identification of [Appellant] in the photo spread.

xv. This Court finds that the State did not possess probable cause to charge [Appellant] by petition with this capital murder any time before May 8, 2017, when police learned in newly developed evidence that [Appellant] was in fact the person [A.V.] knew as Jay, present during the murder, who lured [A.V.] to bring drugs to the scene, and who then took those drugs from him after one of his co-actors displayed a gun.

The juvenile court concluded its order as follows:

Based on the above [findings], as well as the totality of the evidence presented in the clerk's record, at the hearing, in the written reports, studies, and investigations, this Court ORDERS and CERTIFIES that its jurisdiction sitting as a Juvenile Court, be WAIVED, and that [Appellant] be transferred to the Criminal District Court of Harris

15

County, Texas, for criminal proceedings to be dealt with as an adult in accordance with the Code of Criminal Procedure.

This interlocutory appeal followed.[4]  *See* TEX. FAM. CODE § 56.01(c)(1)(A).

## Order Waiving Jurisdiction and Transferring Case

In his sole issue, Appellant questions the sufficiency of the evidence to support the juvenile court's finding that it was beyond the State's control to proceed to certification before his 18th birthday and its finding that the State exercised due diligence in pursuing charges against him before he turned 18.

### A.    Applicable Legal Principles

A juvenile court has exclusive original jurisdiction over all proceedings involving a person who has engaged in delinquent conduct based on acts committed before age 17.  *See* TEX. FAM. CODE §§ 51.02(2)(A), 51.04(a).  Family Code Section 54.02 governs the waiver of a juvenile court's exclusive original jurisdiction and transfer to criminal district court.  *See id.* § 54.02.

Here, the State did not initiate proceedings in juvenile court against Appellant until after his 18th birthday.  Thus, the juvenile court had two options under its limited jurisdiction: it could dismiss the case or transfer it to criminal district court.  *See Moore v. State*, 532 S.W.3d 400, 405 (Tex. Crim. App. 2017)

---

[4]    Appellant filed his notice of appeal on March 27, 2018; however, the Clerk of this Court did not receive the notice of appeal from the district clerk's office until August 28, 2018, five months after the notice of appeal was filed.

16

(citing *In re N.J.A.*, 997 S.W.2d 554, 556 (Tex. 1999)).[5]  As applicable here, the State had to prove, by a preponderance of the evidence, the following criteria listed in Family Code Section 54.02(j) to be entitled to transfer:

> (j) The juvenile court may waive its exclusive original jurisdiction and transfer a person to the appropriate district court or criminal district court for criminal proceedings if:
>
> > (1) the person is 18 years of age or older;
> >
> > (2) the person was:
> >
> > > (A) 10 years of age or older and under 17 years of age at the time the person is alleged to have committed a capital felony or an offense under Section 19.02, Penal Code;
> > >
> > > . . . .
> >
> > (3) no adjudication concerning the alleged offense has been made or no adjudication hearing concerning the offense has been conducted;
> >
> > (4) the juvenile court finds from a preponderance of the evidence that:
> >
> > > (A) for a reason beyond the control of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person; or

---

[5]  In *Moore*, the Court of Criminal Appeals noted an exception to the rule that, after an accused reaches the age of 18, a juvenile court must dismiss or transfer the case.  That exception is found in Family Code Section 51.0412, which applies to incomplete proceedings.  *Moore v. State*, 532 S.W.3d 400, 404 n.4 (Tex. Crim. App. 2017) (citing TEX. FAM. CODE § 51.0412).  This case does not involve an incomplete proceeding.

(B) after due diligence of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person because:

(i) the state did not have probable cause to proceed in juvenile court and new evidence has been found since the 18th birthday of the person; [and]

. . . .

(5) the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged.

TEX. FAM. CODE § 54.02(j); *see also Moon v. State*, 451 S.W.3d 28, 45 (Tex. Crim. App. 2014) ("[T]he burden is on the State to produce evidence that persuades the juvenile court, by a preponderance of the evidence, that waiver of its exclusive jurisdiction is appropriate.").

The dispute in this case centers on whether the State showed by a preponderance of the evidence that either (1) for a reason beyond the control of the State, it was not practicable to proceed in juvenile court before Appellant's 18th birthday, or (2) after due diligence of the State, it was not practicable to proceed because the State did not have probable cause, and new evidence was found after Appellant's 18th birthday. *See* TEX. FAM. CODE § 54.02(j)(4)(A), (B)(i). The juvenile court made findings with respect to each of these two criteria. The court found, for reasons beyond the State's control, it was not practicable for the State to proceed in juvenile court before Appellant's 18th birthday. The juvenile court also

18

found the State had exercised due diligence to pursue the certification petition, but it had not been practicable to proceed in juvenile court because the State did not have probable cause, and new evidence was found after Appellant's 18th birthday, namely, A.V.'s positive identification of Appellant as Jay. On appeal, Appellant challenges the sufficiency of the evidence regarding certain elements of these findings.

We review a challenge to the sufficiency of the evidence supporting a juvenile court's findings of fact regarding a waiver and transfer determination under traditional evidentiary-sufficiency principles. *Moon*, 451 S.W.3d at 47; *In re H.Y.*, 512 S.W.3d 467, 478–79 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). To determine whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *H.Y.*, 512 S.W.3d at 479. If more than a scintilla of evidence supports the finding, then there is legally sufficient evidence to support it, and a legal-sufficiency challenge fails. *Id.* Under a factual sufficiency challenge, we consider all the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

After conducting a "traditional sufficiency of the evidence review" of the juvenile court's specific findings, the appellate court "should then review the juvenile court's ultimate waiver decision under an abuse of discretion standard." *Moon*, 451 S.W.3d at 47. In applying the abuse-of-discretion standard, we conduct our own analysis of the evidence, and determine whether the juvenile court acted without reference to the guiding rules or principles such that its decision to transfer the case was "essentially arbitrary, given the evidence upon which it was based." *Id.*

**B.    Analysis**

*1.    Reason Beyond the Control of the State*

With foregoing standards in mind, we turn to Appellant's claim that the evidence, admitted during the hearing on the State's request to transfer his case, "did not support" the juvenile court's finding that "for a reason beyond the control of the State, it was not practicable to proceed in juvenile court by petition before [Appellant's] 18th birthday." *See* TEX. FAM. CODE § 54.02(j)(4)(A). In his brief, Appellant focuses on the phrase "beyond the control of the State," asserting that the evidence did not show that it was beyond the State's control to proceed in the juvenile court before Appellant turned 18.

In making his argument, Appellant relies on *Moore v. State*, claiming that the facts there are like those presented here. 446 S.W.3d 47 (Tex. App.—Houston

20

[1st Dist.] 2014), *aff'd*, 532 S.W.3d 400, 402 (Tex. Crim. App. 2017). In that case, Moore committed sexual assault when he was 16 years old. *Id.* at 49. The complainant identified Moore, and the police began their investigation when Moore was still 16. *Id.* Almost two years later, the police forwarded Moore's case to the district attorney's office, believing Moore to be only 17 years old. *Id.* Moore, however, had turned 18 eleven days earlier. *Id.* In delaying forwarding the charges, the police had relied on a faulty internal police report listing an incorrect birthdate for Moore, making it appear he was one year younger than his actual age. *Id.* Other records in the police's file, however, had listed Moore's correct birthdate. *Id.* The detective handling the case also testified that she had a heavy caseload at the time. *Id.*

Moore was taken into custody, and one year later, the State filed a petition for a discretionary transfer of the case from juvenile court to a criminal district court. *Id.* The juvenile court transferred the case, concluding that, for a reason beyond the State's control, it was not practicable to proceed in juvenile court before Moore's 18th birthday. *Id.*

On appeal, the State asserted that an investigative delay, stemming from the detective's large caseload and a mistake as to Moore's age were reasons beyond its control. *Id.* at 51. We noted that the State had conceded, however, "that the offense was promptly reported and that Moore had been identified as the

21

perpetrator within days after the offense was committed while he was still a juvenile and well short of his seventeenth birthday." *Id.* We further noted that "[t]he correct birthdate was evident in other police records," and "[t]he State did not trace its error in the internal offense report to any outside source." *Id.* Instead, the record demonstrated "that it was the State's clerical error, coupled with its lengthy delay—unaided by any outside event—which caused the case to fall outside the juvenile court's jurisdiction." *Id.* We held that the juvenile court had erred in transferring the case to criminal district court because the police's heavy caseload and their mistake as to Moore's age were not reasons beyond the State's control. *See id.* at 52; *see also* Tex. Fam. Code § 54.02(j)(4)(A).

In his brief, Appellant contends, "Just as in *Moore*, law enforcement's failure to present the case it had to the District Attorney's office regarding the appellant's age was something that was 'knowable.'" Appellant's age was a pre-known fact that could have been discovered with a simple visit with the Juvenile Division Chief."

We agree with the State that the facts of this case are not like those in *Moore*. Here, unlike in *Moore*, the State never disputed that it was aware of Appellant's correct age. A misunderstanding regarding Appellant's age was not the reason proffered by the State for not proceeding in juvenile court until after Appellant turned 18. Instead, the State offered evidence demonstrating that the

22

reason it did not proceed in juvenile court before Appellant turned 18 was because the sole eyewitness, A.V., who said that he knew Jay by sight, made a negative identification of Appellant until after Appellant turned 18. This also stands in contrast to the facts in *Moore* because, there, the complainant positively identified Moore as the perpetrator soon after the offense while he was still 16, and Moore's identity as the perpetrator, unlike here, was not the subject of a continuing investigation. *See Moore*, 446 S.W.3d at 49.

In support of his position, Appellant's brief details evidence showing that the police knew, before Appellant turned 18, that his cell phone was used to communicate with A.V. on the night of the shooting to set up the drug transaction. The police also learned that Appellant was seen immediately after the shooting at his brother's apartment. He appeared upset and said that someone had just been shot. And the police knew that the gate code given to A.V. by Jay was the code used by residents in Building 14 where Appellant's brother lived. However, Appellant told police that he had given Jay a ride to the apartment complex. He said that Jay had borrowed his cell phone, and Jay knew the gate code. A.V.'s negative identification of Appellant as Jay bolstered Appellant's story.

In its findings of fact, the juvenile court not only found Detectives Garcia and Murdock to be credible witnesses, it also made the following unchallenged findings:

iv.   [A.V.] was the only eyewitness to the capital murder, and the only direct evidence of Jay's involvement and of Jay's identity.

v.   [A.V.'s] identification of the three men involved in the capital murder was the only evidence known or available to police that could have refuted [Appellant's] claims to being present at the complex, but uninvolved in the shooting.

vi.   The cell phone records alone linking [Appellant] and [A.V.] to communications near the time of the murder did not overcome [Appellant]'s statement to police. [Appellant] told police that he allowed Jay [to] use his phone. [A.V.] told police he had met Jay multiple times and he would recognize Jay if he saw him again. [A.V.]'s negative identification of [Appellant]'s photograph as the person he recognized and knew as Jay confirmed [Appellant]'s statement that someone else was Jay, not [Appellant].

vii.   [Detective] Murdock testified that after September 1, 2015, the case remained open pending new information because the negative identification from witness [A.V.] defeated any circumstantial evidence that might have shown contact between [Appellant] and the complainant near the time of the complainant's death.

The evidence showed that A.V. initially lied about Appellant's identity out of fear that he would be killed like Wilson. And the evidence showed that A.V.'s dishonesty was an outside force beyond the control of the police. Appellant suggests that the police should have questioned A.V. about his negative identification because they suspected that A.V. recognized Appellant when he first viewed that photo spread and negatively identified Appellant. However, Detective Murdock testified that it would have been inappropriate for him to question A.V.

24

about the identification because it would have been suggestive and could have tainted the process.

Appellant further cites evidence indicating that the police should have tested the car driven by Wilson for Appellant's fingerprints. However, Detective Murdock testified that the police had no information that Jay touched the car. Detective Murdock also testified, "[F]ingerprints on the outside of a car don't mean a whole lot. Anybody can walk by a car and touch it."

Appellant also suggests that the police should have tested Appellant's clothes for gunshot residue. However, the evidence showed that Jay was not the shooter.

We conclude that the evidence offered by the State was more than a scintilla of evidence supporting the trial court's finding that, for a reason beyond the control of the State, it was not practicable to proceed in juvenile court by petition before Appellant's 18th birthday. *See* TEX. FAM. CODE § 54.02(j)(4)(A). We also conclude that the finding was not against the great weight of the evidence. Thus, the evidence was legally and factually sufficient to support the finding.

2. *Due Diligence of the State*

Without tying it to a specific finding of the juvenile court, Appellant also generally alludes that the State did not exercise due diligence in filing the transfer petition in juvenile court before he turned 18. In support of its transfer order, the

trial court found that, "after due diligence of the State it was not practicable to proceed in juvenile court before the 18th birthday of [Appellant] because the State did not have probable cause to proceed on the capital murder charge in 2015 or 2016. Instead, new evidence developed after [Appellant]'s 18th birthday."

"Due diligence requires the State to 'move ahead' or 'reasonably explain delays.'" *In re B.R.H.,* 426 S.W.3d 163, 168 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding) (quoting *In re N.M.P.*, 969 S.W.2d 95, 100 (Tex. App.—Amarillo 1998, no pet.)). Diligence is usually a fact question that the trial court determines considering the circumstances of each case. *Id.*

Here, the evidence showed that the police began immediately investigating Wilson's murder by interviewing witnesses, including A.V., Appellant, Appellant's brother, and Appellant's brother's roommate. The police also soon determined who owned the phone on which Jay had communicated with A.V.

About two weeks after the murder, A.V. viewed the photospread containing Appellant's photograph. However, A.V. negatively identified Appellant as Jay because he feared retaliation. The police obtained a search warrant for A.V.'s and Appellant's cell phone data, but the phone records confirmed only that A.V.'s and Appellant's cell phones communicated before the shooting. The phone records did not necessarily refute Appellant's claim that he had loaned his phone to someone named Jay, a claim bolstered by A.V.'s negative identification of Appellant. The

26

evidence showed that police did not obtain any new leads until A.V., convinced by Wilson's mother to be honest, made a positive identification of Appellant after he turned 18.

In sum, the testimony of Detectives Garcia and Murdock addressed (1) the State's efforts to investigate Wilson's murder, (2) what the State learned in the investigation and when it learned it, and (3) why the State viewed the evidence it had developed as being too weak to prove that Appellant was Jay until A.V. positively identified him. Appellant criticizes the State for not doing more, as discussed above, to identify Appellant as Jay before Appellant turned 18. However, the officials charged with investigating a juvenile case are not required "to 'do everything perceivable and conceivable to avoid delay.'" *Id.* Instead, Section 54.02(j)(4)(B)(i) requires the State to exercise due diligence, a term that suggests the investigation must be reasonable given the information that was gathered during the investigation. *See Collins v. State*, 516 S.W.3d 504, 525 (Tex. App.—Beaumont 2017, pet. denied) (citing TEX. FAM. CODE § 54.02(j)(4)(B)). In determining whether the State exercised due diligence in proceeding against Appellant, the trial court was entitled to consider the evidence showing that A.V.'s intentional misidentification of Appellant delayed the State's investigation. *See id.* (stating that juvenile court was entitled to consider evidence showing that members

of the appellant's family had hindered the investigation into role the appellant played in the offense).

We conclude that the evidence offered by the State was more than a scintilla of evidence supporting the juvenile court's finding that, "after due diligence of the State it was not practicable to proceed in juvenile court before the 18th birthday of [Appellant] because the State did not have probable cause to proceed on the capital murder charge in 2015 or 2016. Instead, new evidence developed after [Appellant]'s 18th birthday."[6] *See* TEX. FAM. CODE § 54.02(j)(4)(B)(i). We also

---

[6] Although he did so in the trial court, Appellant does not specifically challenge the probable cause element on appeal. We note that when "evaluating a determination of probable cause, we consider whether there are sufficient facts and circumstances to support a prudent person's belief that the accused child committed the offense." *In re C.R.*, Nos. 01-18-00185-CV, 01-18-00186-CV, 01-18-00187-CV, 01-18-00188, 2018 WL 4190051, *5 (Tex. App.—Houston [1st Dist.] Aug. 31, 2018, no pet.) (citing *In re J.G.*, 495 S.W.3d 354, 374 (Tex. App.—Houston [1st Dist.] 2016, pet. denied)). "The probable-cause standard 'requires more than mere suspicion but less evidence than needed to support a conviction or support a finding by a preponderance of the evidence.'" *Id.* (quoting *In re C.M.M.*, 503 S.W.3d 692, 702 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997)). Courts apply a totality-of-the-circumstances analysis to determine probable cause. *Id.* (citing *Manuel v. State*, 481 S.W.3d 278, 283 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd)). Here, the juvenile court also found, "Probable cause did not exist in this case before [Appellant] turned 18 years of age on November 9, 2016 because any indications or suspicion that [Appellant] participated in the capital murder, about which police knew before that [Appellant] turned 18, was defeated by [A.V.'s] negative identification of [Appellant] in the photo spread." Given the record, the juvenile court, as the factfinder, could have reasonably inferred from the evidence, particularly the testimony of Detectives Garcia and Murdock, that, under the totality of the circumstances, including A.V.'s negative identification of Appellant, that the State did not have probable cause to proceed against Appellant until after he turned 18 when A.V. made a positive identification. *See Collins v. State*, 516 S.W.3d 504, 524 (Tex. App.—Beaumont 2017, pet. denied) (holding

conclude that the finding was not against the great weight of the evidence. Thus, the evidence was legally and factually sufficient to support the finding.

Having determined that the juvenile court's challenged findings are supported by sufficient evidence, we now review the ultimate waiver decision to determine whether the juvenile court abused its discretion. *See Moon*, 451 S.W.3d at 47. Given the evidence in the record and the trial court's findings, we conclude that the juvenile court's decision to transfer Appellant to criminal district court for prosecution as an adult was not arbitrary, but instead represented a reasonably principled application of the legislative criteria found in Section 54.02(j). Thus, we hold that the juvenile court did not abuse its discretion in waiving its exclusive jurisdiction and transferring Appellant to criminal district court.

---

that, if juvenile court could have reasonably inferred that State acted diligently to investigate case before accused turned 18 and could have also reasonably inferred that investigation that occurred before accused turned 18 failed to develop sufficient reliable evidence to allow State to develop probable cause to proceed in juvenile court, then appeals court is not permitted to impose its own opinions even if they might differ).

## Conclusion

We affirm the order of the juvenile court waiving jurisdiction and transferring Appellant to district court for criminal prosecution.


Laura Carter Higley
Justice

Panel consists of Justices Higley, Lloyd, and Caughey.