**Affirmed and Memorandum Opinion filed June 18, 2024**



In The

# Fourteenth Court of Appeals

### NO. 14-23-00969-CV

## IN THE MATTER OF M. B., Appellant

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2023-01274J**

## MEMORANDUM OPINION

M.B. appeals the juvenile court's order waiving jurisdiction and transferring M.B.'s case to the criminal district court so he could be tried as an adult. He raises two issues. First that there was legally and factually insufficient evidence to support the probable cause finding by the juvenile court. Second that there is legally and factually insufficient evidence to support the section 54.02(f) findings necessary to transfer the cause to the criminal district court. We affirm the juvenile court's order.

BACKGROUND

The State's petition alleged that M.B. was over the age of ten years and under the age of seventeen years when he engaged in "delinquent conduct." Specifically, the State alleged that on August 7, 2022, M.B. unlawfully, intentionally, and knowingly caused the death of Patrick Jackson by shooting Jackson with a firearm. The State's petition further alleged that M.B. unlawfully intended to cause serious bodily injury to Jackson and did cause the death of Jackson by intentionally and knowingly committing an act clearly dangerous to human life, namely shooting Jackson with a firearm. At the time of the alleged offense, M.B. was fifteen years old. At the time of the proceedings, M.B. was sixteen years old.

The State moved the juvenile court to waive its exclusive jurisdiction and transfer M.B.'s case to a district court for criminal proceedings. The juvenile court conducted a hearing on the State's motion.

A detective from the Houston Police Department testified he responded to a "person down" call on August 7, 2022. The location was an apartment complex. Upon arrival at the scene, the detective saw a deceased male who had been shot in the chest, the neck, and the mid-back. Near the decedent was a yellow and green bicycle. The decedent did not have any identification, wallet, phone, or money on his person but was wearing an ankle monitor. The decedent's mother identified him as Patrick Jackson and indicated that he was a "documented gang member." Jackson's mother indicated he was out on bond for an assault. While on scene, the detective looked into possible surveillance camera footage of the murder. The detective testified that he was able to identify three surveillance cameras and review their recordings from the day of the murder. Two of the recordings from

the surveillance cameras were admitted into evidence and played for the court. The detective also testified about what the recordings depicted.

From one of the surveillance cameras, the detective was able to identify M.B. as an individual at the apartment complex and in the area at the time Patrick was murdered. The recording shows a young black male walking both away from and toward the surveillance camera. The recording shows this male to be wearing an orange shirt with a distinctive image on the back; it appears to be flowers. The back image is large and takes up a majority of the back of the shirt. The front image appears to be the same but is smaller and only on the left chest portion of the front of the shirt. The male is also seen wearing mismatched socks: a white sock (with either black or blue on the bottom) on his left foot and a black sock on his right foot. The male is also wearing black pants and a necklace that appears to have large letters spelling out the word "BLUE." The male's face is clearly shown in this recording as he walks toward the surveillance camera.

To identify M.B., the detective used the image from this recording and researched the Houston Police Department's gang-database. Once he had identified M.B., the detective also confirmed M.B. as the individual in this recording through M.B.'s mother.

The detective testified regarding another surveillance recording depicting the apartment complex from the same angle just prior to Patrick's murder. The detective testified that the video depicts the courtyard area, near where Patrick was shot. The beginning of the recording shows the bottom portion of a bicycle—the two tires of the bicycle and a leg. Shortly after the bicycle passes the camera, a black male wearing a green and yellow shirt (which says 'Stay Trippy' and has a large smiley face on the back), shorts, and black socks, walks away from the camera toward the courtyard area. This male has his right hand near his hip and

3

appears to be holding something in his waistband, though the object is not clearly depicted in this recording. This male is seen walking along the courtyard and out of sight. Another male appears in the recording walking away from the camera. This male is wearing an orange shirt with the same image on the back as the male in the prior recording. This male also has a white sock (with either black or blue on the bottom) on his left foot and a black sock on his right foot. However, this male is wearing a head and face covering with a camouflage pattern and what appears to be Crocs on his feet. This male appears to have different pants on than the male in the first recording. As he walks away from the camera, he appears to be holding a rectangular item in his left hand along the waistband of his pants. This male walks to the edge of the courtyard and stops, looking toward the area where the bicycle was travelling just prior. This male appears to be holding a phone to his left ear with his right hand while his left hand continues to hold something at the waist of his pants. This male paces along the courtyard edge, still appearing to be on the phone, for approximately thirty seconds. The male then turns toward the camera, still holding his waistband, and starts jogging with his head down. As he gets closer to the camera, at 1:08 of the recording, the male has a gun in his left hand, a black rectangle in his right hand that appears to be a phone, and a necklace that appears to be identical to the one in the prior recording.

The detective testified that in the recording the male in the orange shirt is talking with someone on a phone in his right hand while his left had "appears to be [holding] a black pistol with an extended magazine." The detective testified that the black male in the orange shirt in this second recording appeared similar to the one in the first recording, wearing the same clothing, including the mismatched socks, with the addition of Crocs and a head covering. The second recording was "minutes before the first call to 911 was recorded of a person down."

4

The detective testified that he made contact with a possible witness. The detective testified that this witness told him that he and M.B. and a third individual known as "MK" were at apartment 305 on the day of Patrick Jackson's murder. Apartment 305 is a "trap house, or in laymen's terms, a place where they sell narcotics" in the apartment complex where Jackson was murdered. The witness stated that M.B. and MK were in the apartment playing video games prior to the murder. The witness indicated that M.B. announced that "Lil Pat or Pat" was in the area and that they should "go slap his bitch ass down." The witness reported that M.B. wrapped his head in a bandana, was wearing "gang-affiliated" clothing at the time, and grabbed a black semiautomatic handgun while MK grabbed a silver .357 magnum revolver. M.B. and MK then left the apartment. The witness reported hearing three or four gunshots shortly thereafter but did not see Jackson get shot. The witness further reported once M.B. and MK returned to the apartment, M.B. said, "Oh, did you see the look on his face? He looked so scared," laughing about it. The detective testified that he showed the witness the surveillance recording depicting the two males just prior to the shooting. The witness identified the male with the "Stay Trippy" logo as MK and the other as M.B.

The detective further investigated and was able to locate MK in the Fort Bend County Jail. The detective showed MK the recording depicting the apartment complex just prior to the shooting, and MK identified himself in the recording by his clothing. MK confirmed that prior to the murder he and M.B. were playing video games in the apartment. MK confirmed he had a revolver and M.B. had a black semiautomatic pistol. MK admitted that he and M.B. cornered Jackson and that M.B. was the only one who fired. The detective testified that MK's statements "lined up generally" with the multiple shell casings recovered at

the scene. The detective testified that an "intact projectile, or bullet" was recovered and it was consistent with the semiautomatic weapon M.B. was carrying. The detective testified that the firearm was recovered in a later traffic stop of another "documented [] gang member" of the same gang affiliation as M.B.

On cross-examination, the detective testified that the witness had an "extensive criminal history" but that he was unaware that the witness was given any incentive for statement against M.B.

A "court services manager" from the Harris County Juvenile Probation Department testified regarding a psychological report conducted on M.B., which was admitted as an exhibit. The report, read into evidence by the manager, states that M.B.'s general cognitive ability is in the "extremely low range of intellectual functioning," but the report does not conclude that M.B. was not fit to proceed. According to the report, M.B.'s overall risk for re-offense is moderate and it is believed that with certain interventions M.B.'s overall risk could be significantly reduced. Such changes include mental health treatment, consistent monitoring, supervision, and a change in environment. M.B.'s mother was interviewed and described M.B. as highly suggestible and sensitive to peer pressure. The report indicates factors that "significantly reduce [M.B.]'s risk of re-offense, including his highly supportive mother, his positive response to consistent structure, and his hopes for the future to attend college, own a business, and be a good father to his son."

On cross-examination, the State had the manager review the State's evaluation and report, also admitted as an exhibit to the hearing. The manager testified that in comparing the reports, the State's report appeared "more thorough as to the referral history." The doctor that prepared the State's report also had "discovery materials," such as documents from M.B.'s school district, to review in

completing M.B.'s evaluation, whereas the other report did not state or document that its author had reviewed such documents in making the evaluation and recommendation. The State's report indicates that when "the index offense is included and when considering all three scales, [M.B.'s] overall risk for dangerousness increased to the high range." Without considering the index offense, the risk was considered medium.

The juvenile court rendered an order waiving its exclusive jurisdiction and transferring the case to the criminal district court for proceedings. In its order the juvenile court stated it based its decision on the following reasons:

> "[M.B.] is charged with a violation of a penal law of the grade of felony, namely MURDER, committed on or about the 7th day of August, 2022.
>
> There has been no adjudication of this offense.
>
> [M.B.] was 15 years of age or older at the time of the commission of the alleged offense . . . .
>
> There is probable cause to believe the [M.B.] committed the Murder alleged . . . .
>
> Because of the seriousness of the alleged Murder, and this juvenile respondent's conduct during it, the welfare of the community requires criminal proceedings.
>
> The background of the juvenile respondent necessitates transfer to criminal district court for the welfare of the community.

The juvenile court considered that the offense was against the person, the sophistication and maturity of M.B., the record and previous history of M.B., and "the prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by use of procedures, services and facilities currently available to the Juvenile Court."

7

Texas juvenile courts have exclusive, original jurisdiction over cases involving what otherwise would be criminal conduct by children 10 or older but younger than 17. *See* Tex. Fam. Code §§ 51.02(2), 51.03(a), 51.04(a). If a juvenile court determines after an evidentiary hearing that certain requirements are satisfied, it may waive its jurisdiction and transfer a child to the district court for criminal proceedings. *Id*. § 54.02(a), (c). "The transfer of a juvenile offender from juvenile court to criminal court for prosecution as an adult should be regarded as the exception, not the rule; the operative principle is that, whenever feasible, children and adolescents below a certain age should be 'protected and rehabilitated rather than subjected to the harshness of the criminal system.'" *Ex parte Thomas*, 623 S.W.3d 370, 376 (Tex. Crim. App. 2021) (quoting *Hidalgo v. State*, 983 S.W.2d 746, 754 (Tex. Crim. App. 1999)).

Under section 54.02(a), a juvenile court may waive its exclusive original jurisdiction and transfer a child to an appropriate district court or criminal district court for criminal proceedings if:

> (1) the child is alleged to have violated a penal law of the grade of felony;
>
> (2) the child was:
>
> > . . .
> >
> > (B) 15 years of age or older at the time he is alleged to have committed the offense, and no adjudication hearing has been conducted concerning that offense; and
>
> (3) after full investigation and hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense or the background of the child the welfare of the community requires criminal proceedings.

8

Tex. Fam. Code § 54.02(a). The state has the burden of proof to show by a preponderance of the evidence that the welfare of the community requires transfer of jurisdiction for criminal proceedings, either due to the seriousness of the offense alleged or the background of the child or both. *Bell v. State*, 649 S.W.3d 867, 886 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). In making such a determination:

> [T]he juvenile court shall consider among other matters:
>
> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (2) whether the alleged offense was committed in an aggressive and premeditated manner;
>
> (3) whether there is evidence on which a grand jury may be expected to return an indictment;
>
> (4) the sophistication and maturity of the child;
>
> (5) the record and previous history of the child; and
>
> (6) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

Tex. Fam. Code § 54.02(f). "Any combination of these criteria may suffice to support a waiver of jurisdiction; not every criterion need weigh in favor of transfer." *In re C.M.M.*, 503 S.W.3d 692, 701 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The factors listed in section 54.02(f) are non-exclusive. *Bell*, 649 S.W.3d at 886.

If the juvenile court waives jurisdiction, "it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court." Tex. Fam. Code § 54.02(h). The statutory scheme directs the juvenile court to state the reasons for the waiver set out in the statute. *Thomas*, 623 S.W.3d at 379. Section 54.02(h) allows for findings but does not require case-

9

specific fact-finding beyond a statement of the reasons for transfer. *See* Tex. Fam. Code § 52.04(h); *Thomas*, 623 S.W.3d at 379.

We review a juvenile court's decision to waive its exclusive original jurisdiction and transfer a case to criminal district court using two steps. *Id*. at 887. First, we review the juvenile court's findings using the traditional evidentiary sufficiency review. *Id*. In reviewing legal sufficiency, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *In re C.M.M.*, 503 S.W.3d at 701. If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. *Id*. In reviewing factual sufficiency, we consider all evidence presented to determine if the court's findings are against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. *Id*.

If the juvenile court's findings are supported by sufficient evidence, then we move to the second step—reviewing the ultimate waiver decision for an abuse of discretion. *Id*. at 701. A court abuses its discretion if it acts without reference to any guiding rules and principles. *In re Nat'l Lloyds Ins.*, 507 S.W.3d 219, 226 (Tex. 2016) (orig. proceeding).

## PROBABLE CAUSE

In his first issue, M.B. asserts the evidence is legally and factually insufficient to support the juvenile court's conclusion that there was probable cause to believe that M.B. committed the alleged murder.[1] M.B. argues that there is

---

[1] M.B. also asserts that there is legally and factually insufficient evidence to support the trial court's probable cause determination on the charge of aggravated robbery. The Notice of Appeal in this cause is from the "certification judgment . . . entered [in] Cause No. 2023-01274J." The order attached to the notice of appeal was the juvenile court's order waiving its jurisdiction on murder offense. Neither the order nor the notice of appeal request and appeal from the certification judgment for the offense of aggravated robbery. A separate appeal was filed for the juvenile court's certification order on the offense of aggravated robbery and was

10

insufficient evidence that he shot Jackson. M.B. contends that evidence showed that "basic investigative steps were not taken" by police and the surveillance does not link him to the murder or any gun used in the murder. M.B. argues there are no eyewitnesses connecting M.B. to the murder and "very basic investigative steps" were not taken.

"'Probable cause' is defined as sufficient facts and circumstances to warrant a prudent person to believe the suspect committed . . . the offense." *In re C.M.M.*, 503 S.W.3d at 702. "Probable cause is based on probabilities; it requires more than mere suspicion but less evidence than that needed to support a conviction or support a finding by a preponderance of the evidence." *Id*. "Probable cause exists where the police have reasonably trustworthy information sufficient to warrant a reasonable person to believe a particular person has committed . . . an offense." *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997). A person commits murder, as applicable here, if the person "(1) intentionally or knowingly causes the death of an individual; [or] (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code § 19.02(b).

The standard for determining whether probable cause exists is much lower than the burden of proof necessary to convict M.B. of murder. *See Guzman*, 955 S.W.2d at 87 ("Probable cause deals with probabilities; it requires more than mere suspicion but far less evidence than that needed to support a conviction or even that needed to support a finding by a preponderance of the evidence."). M.B. focuses on the fact that the surveillance footage does not show M.B. shooting

---

dismissed as untimely. *In re M.B.*, No. 14-24-00060-CV, 2024 WL 632539 (Tex. App.—Houston [14th Dist.] Feb. 15, 2024, no pet.). Thus, we do not address this issue herein because it was not timely appealed or noticed in M.B.'s notice of appeal in this case. *See* Tex. R. App. P. 25.2.

Jackson. However, it is not necessary to have surveillance footage of the shooting to support a probable cause determination. The trial court, as fact finder, viewed the evidence admitted during the hearing, including the surveillance camera footage of M.B. and MK in the apartment complex on the day-of and moments prior to Jackson's murder. The trial court also heard the testimony of the detective regarding his interviews of MK and another witness. MK and the other witness placed M.B. at the apartment complex at the time of Jackson's murder. Both witnesses claimed to be at the apartment before and after the shooting with both M.B. and MK and provided details to corroborate one another's stories. The other witness indicated that M.B. described Jackson's face when he was shot. The detective also indicated that M.B.'s mother identified M.B. in the surveillance recording. More than a scintilla of evidence supports the juvenile court's finding of probable cause. *See In re C.M.M.*, 503 S.W.3d at 701; *see also Matlock v. State*, No. 08-07-00227-CR, 2009 WL 2973515, *4 (Tex. App.—El Paso Sept. 16, 2009, pet. ref'd) (not designated for publication) (probable cause existed when "two separate and independent accomplice witnesses" gave detailed statements and statements included admissions that they had engaged in criminal activities).

Even disregarding the surveillance recording evidence as M.B. suggests, two witnesses place M.B. at the apartment complex at the time of Jackson's murder. Both witnesses indicated that M.B. instigated the attack on Jackson and M.B. convinced MK to participate. Both witnesses indicated that M.B. was the one carrying the semiautomatic gun. MK directly implicated M.B. as the shooter, and the detective confirmed that the evidence recovered at the scene suggested that the semiautomatic, and not the revolver MK was carrying, was the murder weapon. While M.B. argued that one of the witnesses may have received some incentive to make a statement against M.B., there was no evidence of such incentive. While

12

M.B. contends that "basic investigative steps" were not taken, he has not identified these steps or their implications on the sufficiency of the evidence presented. The evidence rises above that of "mere suspicion" as argued by M.B. on appeal and is legally sufficient and not factually insufficient to support the trial court's probable cause determination. *See Matlock*, 2009 WL 2973515, at *4; *see also In re J.T.T.*, No. 01-23-00358-CV, 2023 WL 7311217, *8 (Tex. App.—Houston [1st Dist.] Nov. 7, 2023, pet. filed) (mem. op.) (holding law enforcement had probable cause when an accomplice statement implicated the juvenile defendant in murder because it was a statement against the accomplice's own interest).

We overrule M.B.'s first issue.

## SECTION 54.02 FACTORS

Concluding that there is sufficient evidence of probable cause, we move to M.B.'s second issue, which is a challenge to the legal and factual sufficiency of the evidence of the section 54.02 factors. *See* Tex. Fam. Code § 54.02(f).

In its order waiving jurisdiction, the juvenile court considered: (1) that the offense was against a person; (2) the sophistication and maturity of M.B.; (3) the record and previous history of M.B.; and (4) "the prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by use of procedures, services and facilities currently available to the Juvenile Court." The juvenile court considered four of the factors set out in the Code in making its decision to waive jurisdiction. *See* Tex. Fam. Code § 54.02(f). "Any combination of these criteria may suffice to support a waiver of jurisdiction; not every criterion need weigh in favor of transfer." *In re C.M.M.*, 503 S.W.3d at 701.

13

## A. Offense Against the Person

The first factor weighs heavily in favor of transfer because M.B. is charged with an offense against a person, namely murder. *See* Tex. Fam. Code § 54.02(f)(1). Murder is a first-degree felony and a serious offense against a person. *See* Tex. Penal Code §§ 12.04(a) ("Classification of Felonies"), 19.02(c) (murder is first-degree felony offense). Moreover, the murder is alleged to have been committed with a firearm. *See In re T.C.*, No. 06-21-00075-CV, 2022 WL 398419, *4 (Tex. App.—Texarkana Feb. 10, 2022, no pet.) (mem. op.) ("Because T.C.'s offense against a person resulted in a shooting, the offenses weighed heavily in favor of transfer.").

M.B. contends that a lack of evidence linking M.B. to the murder delayed the proceedings. However, as analyzed above, there is at least sufficient evidence of probable cause connecting M.B. to Jackson's murder. Otherwise, M.B. does not dispute that because murder is an offense against the person, this factor weighs in favor of transfer.

## B. Maturity and Sophistication

M.B.'s certification evaluation concluded that M.B. "exhibits *Below Average level* of intellectual based sophistication and *Average criminal sophistication* in comparison to most adolescent offenders when the index offense is excluded and included." The evaluation further concluded that M.B. exhibits "a *Below Average level* of maturity when the index offense if excluded and included. However, while relevant, this evidence is not necessarily determinative of a child's sophistication and maturity. *See Bell*, 649 S.W.3d at 893.

"In assessing the sophistication and maturity of the child, the juvenile court places emphasis on whether the evidence shows that the child knew right from

wrong and could assist his attorney in his defense." *Id.* at 892. Here, the evaluation also showed that M.B. understood the nature of the charges against him and that if he were "certified" he would go to "adult prison." M.B. acknowledged that a more serious crime would be "capital murder" and a less serious crime would be trespassing. M.B. understood the court makes the final decision regarding certification but that the district attorney is the one requesting the certification. When asked to give a true statement, the evaluation indicates that M.B. was "somewhat unclear at first and said something that was untrue" but then clarified the statement with a true statement saying, "I have one son." When asked to provide an untrue statement, M.B. responded, "I have six kids."

Evidence that the juvenile is not intellectually disabled, is capable of understanding the proceedings against him, could assist attorneys in his defense, and is intellectually capable of distinguishing right from wrong are all relevant to a determination of the juvenile's maturity and sophistication to support upholding the juvenile court's transfer decision. *See id.* at 893 (collecting cases). How to weigh the evidence is within the juvenile court's discretion. *Id.*

Here, there is more than a scintilla of evidence supporting the trial court's determination regarding M.B.'s sophistication and maturity. There is evidence that M.B. is below average level of maturity. However, considering all the evidence— including that M.B. could assist his counsel in defense, understood the difference between the juvenile and adult system, and understood the seriousness of the charge against him—we cannot say that M.B.'s below average maturity level is enough to render the juvenile court's finding against the great weight and preponderance of the evidence. *See Bell*, 649 S.W.3d at 893 (evidence was legally sufficient and not factually insufficient to support child's sophistication and maturity element when child knew right from wrong and could assist attorney in

his defense but was "functioning well below grade level" and had an "IQ of 78"); *In re K.J.*, 493 S.W.3d 140, 151–52 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (reasoning there was evidence both supporting and not supporting a finding of maturity and sophistication and noting that "there need not be evidence in support of every section 54.02(f) factor weighing in favor of transfer, so long as there is sufficient evidence overall to justify the juvenile court's decision").

We conclude the evidence is legally sufficient and not factually insufficient to support that M.B.'s maturity and sophistication supported the juvenile court's waiver of its jurisdiction.

## C.    Record and Previous History

M.B.'s record and previous history shows that he has been referred to the juvenile system previously. M.B. was placed in a deferred adjudication program for six months for a criminal trespass charge. Later he was again charged with criminal trespass and placed in a "Second Chance Deferred Prosecution Program," which he successfully completed. M.B. was then charged with "Evading Detention and Criminal Trespassing in a Vehicle" for which a charge for the criminal trespass in a vehicle was "rejected" by the district attorney. M.B. was placed into a "Diversion 180" program. Since being detained in September 2022, M.B. has incurred thirteen behavioral infractions; in 2023 he received an additional eleven behavioral infractions.

In his evaluation, M.B. admitted to being in a gang since the age of twelve or thirteen. M.B. also admitted that although his mother moved him across the city to "put some distance" between M.B. and his gang-peers, M.B. ran away from home to spend time with the gang. M.B. also admitted that his neck tattoo is representative of his membership in a particular gang. "A juvenile court may give significant weight to a child's gang affiliation when assessing the child's previous

history." *Bell*, 649 S.W.3d at 895; *In re S.G.R.*, 496 S.W.3d 235, 242 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("A juvenile court does not err by according significant weight to evidence of affiliation with a criminal street gang in connection with a child's record and previous history, as these gangs are by definition regularly engaged in criminal activities.").

M.B.'s school records indicate that prior to being detained he had several behavioral infractions, including five out of school suspensions. M.B. indicated that the majority of his behavioral infractions were from fights. The juvenile court may also consider disciplinary measures taken while the child is in the juvenile detention facility following the commission of the offense. *Bell*, 649 S.W.3d at 895. The juvenile court may also consider the disciplinary measures taken by the child's school. *Id.*

Excluding the current charge of murder, M.B.'s "Risk of Dangerousness" is considered in the "middle range" due to his history of engaging in fights. M.B.'s psychopathic features also fell in the "middle range" because he controls his behavior when it may negatively affect him as opposed to any empathy for his victims. The report concludes that, excluding the murder charge, M.B.'s overall risk of dangerousness "falls in the Middle range." When the murder charge is included, the risk level increased to the high range.

M.B. contends that because he has not previously had the benefit of the juvenile system's programs or services and M.B.'s statement that he is highly motivated to make changes, there is insufficient evidence to support this factor in favor of transfer. The juvenile court as fact finder is entitled to weigh the evidence presented. *See In re S.G.R.*, 496 S.W.3d at 241.

There is more than a scintilla of evidence supporting the trial court's determination regarding M.B.'s record and previous history. The great weight and

preponderance of the evidence is not to the contrary. Therefore, the evidence is legally sufficient and not factually insufficient to support that M.B.'s record and previous history supported the juvenile court's waiver of its jurisdiction.

**D.     Prospects of Adequate Protection of the Public and Likelihood of Reasonable Rehabilitation**

In the evaluation, with regard to his prior encounters or negative acts, M.B. stated that he has "no regrets in life at all" and that he does not think about the crimes he has committed in the past. M.B. reportedly "sometimes" admits to wrongdoing, but there are other times where he denies or attempts to minimize his involvement. The evaluation notes that M.B., while under community-based supervision, "struggled with abiding by household rules, completing various tasks on time . . . , leaving home without permission, continuing to socialize with negative peers, not attending school as agreed upon, and running away for days to months at a time." M.B. also indicated his motivation to be involved with treatment was a "two" out of ten, with ten being the most motivated. The evaluation noted concerns regarding "defensiveness, difficulties with insight, repression, and an intense focus on power and control." M.B. recognized that remaining in the juvenile system was a "second chance" and he was highly confident in his ability to make positive changes.

The evaluation indicates that "in light of the results derived from the clinical and forensic assessment results, record review, and the narrative assessment of [M.B.'s] level of Treatment Amenability, it is felt that [M.B.] presents a below average level of Treatment Amenability when compared to most juvenile offenders his age. This is true for when the offenses are included and excluded."

With regard to adequate protection for the public, the evaluation notes that M.B. has "low empathy/remorse, and a lack of concern for others" and "accepting

responsibility and making amends are difficult for him due to his lack of concern for the majority of people around him." When characterizing M.B.'s risk for reoffending, the evaluation states that "[o]verall . . . it is believed that without treatment or legal consequences of any kind, [M.B.] is at a Moderate Risk for some type of reoffending when compared to other juvenile offenders, with the index offenses excluded." The risk increased to high when the index offenses are included. Further, as noted above, the report concludes that, excluding the murder charge, M.B.'s overall risk of dangerousness "falls in the Middle range." When the murder charge is included, the risk level increased to the high range.

"The juvenile court may consider the serious nature of the offense committed by the child, as well as any gang affiliation, in determining whether the protection of the public and the likelihood that the child can be rehabilitated weigh in favor of transfer." *Bell*, 649 S.W.3d at 897. Even when an evaluation or psychiatric report recommends treatments offered by the juvenile system that *may* benefit the child, such are recommendations for the juvenile court to consider and weigh in making a transfer decision. *See id*.

There is more than a scintilla of evidence supporting the trial court's determination regarding adequate protection of the public and likelihood of rehabilitation. The great weight and preponderance of the evidence is not to the contrary. Therefore, the evidence is legally sufficient and not factually insufficient to support the juvenile court's finding that section 54.02(f) weighed in favor of the waiver of its jurisdiction.

### E.    Conclusion

Based on the evidence presented and considered, applying the evidentiary sufficiency standards, we conclude that the evidence is sufficient to support the juvenile court's findings under section 54.02(f).

## ULTIMATE WAIVER DECISION

Concluding that sufficient evidence supports the juvenile court's findings of probable cause under section 54.02(f), we move to step two of our inquiry: whether the juvenile court's ultimate waiver decision was an abuse of discretion. M.B. argues that the decision to transfer was arbitrary based on M.B.'s background, level of maturity, his amenability to treatment, and "lack of documented gang involvement."

While there is some conflicting evidence in the record, as we concluded above, the great weight and preponderance of the evidence is not contrary to the juvenile court's findings. The juvenile court, in its role as fact finder, "was the sole judge of witness credibility, could choose to believe or disbelieve a witness's testimony, in whole or in part, and was tasked with weighing the evidence and resolving inconsistencies." *Bell*, 648 S.W.3d at 896. As detailed above, we concluded there is sufficient evidence to support each of the findings made by the juvenile court. The factors considered by the juvenile court are listed in section 54.02(f) and are non-exclusive. *Id*. at 886. Any combination of factors may suffice to support a waiver of the juvenile court's jurisdiction and not every factor need weigh in favor of transfer. *Id*.; *In re C.M.M.*, 503 S.W.3d at 701.

Based on the evidence presented and the substantial deference given to the juvenile court, we cannot conclude the juvenile court's decision was arbitrary or made without reference to guiding rules. Thus, we conclude the juvenile court did not abuse its discretion in waiving jurisdiction and transferring this cause to the district court for criminal proceedings. We overrule M.B.'s second issue on appeal.

**CONCLUSION**

Juvenile courts have substantial discretion in making a transfer decision. *See Ex parte Thomas*, 623 S.W.3d 370, 380 (Tex. Crim. App. 2021). We affirm the juvenile court's order.

/s/    Ken Wise
        Justice

Panel consists of Justices Wise, Spain, and Hassan.