**Affirmed and Memorandum Opinion filed September 19, 2024.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-24-00223-CV

---

## IN THE MATTER OF C.M.

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2023-00562J**

---

## M E M O R A N D U M   O P I N I O N

In this accelerated appeal, C.M., a minor charged with capital murder, challenges the juvenile court's order waiving its exclusive original jurisdiction and transferring him to a criminal district court for trial as an adult. The State moved for the juvenile court to waive its jurisdiction pursuant to Texas Family Code section 54.02(a), and the juvenile court granted the motion after a hearing. *See* Tex. Fam. Code § 54.02(a). In two issues, C.M. challenges the order on the grounds that the evidence is legally and factually insufficient to support the trial court's findings on probable cause and the section 54.02 factors. We affirm.

## *Governing Law*

Texas juvenile courts have exclusive, original jurisdiction over cases involving delinquent conduct by children between ten and seventeen years old. *See id*. §§ 51.02(2), 51.03(a), 51.04(a). However, if a juvenile court determines after an evidentiary hearing that certain requirements are satisfied, it may waive its jurisdiction and transfer a child to a district court for criminal proceedings. *Id*. § 54.02(a), (c). Such transfers "should be regarded as the exception, not the rule; the operative principle is that, whenever feasible, children and adolescents below a certain age should be 'protected and rehabilitated rather than subjected to the harshness of the criminal system.'" *Ex parte Thomas*, 623 S.W.3d 370, 376 (Tex. Crim. App. 2021) (quoting *Hidalgo v. State*, 983 S.W.2d 746, 754 (Tex. Crim. App. 1999)).

Under section 54.02(a), a juvenile court may waive its exclusive original jurisdiction and transfer a child to an appropriate district court or criminal district court for criminal proceedings if:

> (1) the child is alleged to have violated a penal law of the grade of felony;
>
> (2) the child was:
>
> . . .
>
> (B) 15 years of age or older at the time he is alleged to have committed the offense, and no adjudication hearing has been conducted concerning that offense; and
>
> (3) after full investigation and hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense or the background of the child the welfare of the community requires criminal proceedings.

2

Tex. Fam. Code § 54.02(a).

The State has the burden of proof to show by a preponderance of the evidence that the welfare of the community requires a transfer of jurisdiction for criminal proceedings, either due to the seriousness of the offense alleged or the background of the child or both. *Bell v. State*, 649 S.W.3d 867, 886 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). In making such a determination:

> [T]he juvenile court shall consider among other matters:
>
> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (2) whether the alleged offense was committed in an aggressive and premeditated manner;
>
> (3) whether there is evidence on which a grand jury may be expected to return an indictment;
>
> (4) the sophistication and maturity of the child;
>
> (5) the record and previous history of the child; and
>
> (6) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

Tex. Fam. Code § 54.02(f). "Any combination of these criteria may suffice to support a waiver of jurisdiction; not every criterion need weigh in favor of transfer." *In re C.M.M.*, 503 S.W.3d 692, 701 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The factors listed in section 54.02(f) are non-exclusive. *Bell*, 649 S.W.3d at 886. If the juvenile court waives jurisdiction, "it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court." Tex. Fam. Code § 54.02(h); *see also Thomas*, 623 S.W.3d at 379.

We review a juvenile court's decision to waive its exclusive original jurisdiction and transfer a case to criminal district court using two steps. *Bell*, 649 S.W.3d at 887. First, we review the juvenile court's findings using the traditional evidentiary sufficiency review. *Id*. In reviewing legal sufficiency, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *In re C.M.M.*, 503 S.W.3d at 701. If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. *Id*. In reviewing factual sufficiency, we consider all evidence presented to determine if the court's findings are against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. *Id*.

If the juvenile court's findings are supported by sufficient evidence, then we move to the second step—reviewing the ultimate waiver decision for an abuse of discretion. *Id*. A court abuses its discretion if it acts without reference to any guiding rules and principles. *In re Nat'l Lloyds Ins.*, 507 S.W.3d 219, 226 (Tex. 2016) (orig. proceeding).

### *The Hearing*

Ross Watson, a detective sergeant with the Houston Police Department, homicide division, testified that on June 15, 2022, he was dispatched to 8228 Swiss Lane to conduct an investigation into the murder of Anthony Merchant. Previously, on June 13, officers had been called to the same address to investigate the death of Edwin Hill, who was Merchant's stepson. Watson described the investigation into Merchant's death as being rather complicated. An autopsy revealed that Merchant was killed by a single gunshot wound to his chest. When Watson arrived at the scene, he observed an Infiniti SUV parked at an angle in the driveway, two other vehicles parked in the driveway next to the house, and "numerous shell casings in the street directly next to the driveway."

4

At the scene, Watson interviewed Merchant's wife, Edwina Merchant, as well as a tow truck driver. Edwina told Watson that she and Merchant had come to her son's, Hill's, house to retrieve a Bentley automobile that was parked there but was registered in Merchant's name. The keys were apparently lost or stolen, so they had called the tow truck driver. As Merchant and the tow truck driver were in the driveway and Edwina was sitting in the front passenger seat of the Infiniti, she felt something, possibly another vehicle, bump the back of the Infiniti. Someone opened the rear driver's side door, pointed a gun at her, and yelled at Edwina that she was about to die. She was then shot at, so she dove out of the open door to the ground.

Watson further testified that the tow truck driver reported that while he was trying to figure out how to tow a Bentley, he saw Merchant retrieve a holstered firearm from the Bentley and put it into his waistband. Sometime later, he saw a car pull up to the property and several young black males exit the vehicle and run up with masks on their faces and guns drawn. The tow truck driver said he dove to the ground and then "heard a bunch of gunfire." He said he stayed down after that and did not see much.

According to Watson, two 9mm firearms were found at the scene. One, believed to be Merchant's, was found in a holster near where Merchant had been placed on a stretcher, and the other was found in the street near the rear driver's side door of the Infiniti. As previously noted, several spent 9mm and .40 caliber shell casings were also found at the scene.

After the scene was processed, the police received information that a white Nissan Altima that had been under surveillance had been spotted at the scene around the time of the shooting. The vehicle was subsequently stopped for traffic violations. At the time the vehicle was stopped, the occupants included two males

(Marvieon Simien and Quavon Jackson) and four females (Kelsey Love, Emiyah Robinson, Shayah Baptiste, and Janay Davis), who were all brought in for questioning. Love was determined to be the vehicle's owner.

According to Watson, when interviewed, Davis said that the car had been borrowed in the early evening by two young men (Edmund Guillory and Pedro Ochoa), and when it was later returned around 8 p.m. that same day, two other young men (C.M. and Shane Henry) were with them. Henry appeared to be angry and said something about dropping a gun. Davis further indicated that she knew the men and identified them through booking photos. Watson also noted that C.M. had recently appeared in police offense reports with both Guillory and Ochoa.

Watson stated that Robinson made similar statements to those Davis had made, including naming the same four men as returning with the car that evening. She also provided current telephone numbers for C.M. and another one of the men.

Watson reported that Love, who owned the car, said that she loaned it that evening to the same four men as identified by the other women and that they returned it around 8 p.m. She also provided C.M.'s number and said that Henry had appeared angry when they returned. Love reported that the same four men had taken drugs from a house where a dead person was located, a possible reference to Edwin Hill, who had previously been found dead in the house on Swiss Lane.

Baptiste also made similar statements regarding who borrowed the car and who returned with it that evening. She also mentioned people in that group talking about finding a dead body in a home, and she mentioned seeing a photograph of one of the men in Hill's house.

Police were able to exclude both Simien and Jackson, the two males in the white Altima when it was stopped, as suspects in the killing of Merchant.

6

According to cell phone records for Simien's phone, he was not near the location at the time of Merchant's death, and Jackson had been wearing an ankle monitor, which reflected that he was at his own house at the time of the shooting.

Having identified four suspects, Watson next obtained their cell phone records. He discovered that on June 15, Guillory's phone was using a cell tower that was very close to the scene of the crime and was used to call C.M.'s cell phone. C.M.'s and Henry's cell phones also used a cell tower near the scene on the day of Merchant's death. C.M.'s Instagram account also showed communication with Guillory, as well as a photo of illegal drugs posted on June 13. Guillory's phone revealed numerous photographs of him with C.M., including with firearms, and communication between the two on June 15.

Watson also reviewed surveillance video from the day of Merchant's death taken in the area near the scene. From the video, he was able to determine that the white Altima had been "circling in the area for about 45 minutes probably prior to the shooting" and a vehicle matching that description was visible on Swiss Lane immediately before the shooting began. The same video doorbell that captured the vehicle also captured the sound of gunfire shortly thereafter.

Police subsequently arrested Henry and interviewed him. According to Watson, Henry admitted that the group had gone to the scene to commit a robbery. He was given a gun, and the plan was to commit a robbery. C.M. was driving the white Altima. Henry said that when they got to the scene, he opened the door to an SUV at the location, heard gunfire, and began firing his own weapon but then dropped it at the scene. Henry explained that Guillory had also gotten out of the white Altima but C.M. had stayed in. But, Henry also said that both Guillory and C.M. had fired their weapons. Henry said that a couple of days before, he had gone to the house on Swiss Lane with C.M. and Guillory. C.M. and Guillory had entered

7

the house and returned with illegal drugs, saying that there was a dead body inside.

Watson also guided the court through a written timeline of events occurring on June 15 that was admitted into evidence. It shows text messages occurring around 4 p.m. from a member of the group about buying a gun; at 6 p.m., C.M.'s and Henry's cell phones used towers located near where the white Altima was borrowed; a series of text messages among group members indicated an intention to commit a robbery, with members encouraging other members to ensure C.M. came along as well; at 6:39 p.m., video showed the white Altima leaving the apartment complex; from 6:55 p.m. to 7:38 p.m., cell phone records showed the phones of members of the group using cell towers in the area near Swiss Lane; in the same time period, the white Altima is observed on surveillance videos taken in the area; at around 7:38 p.m., video from a doorbell on Swiss Lane showed the vehicle pass by and then recorded the sounds of gunfire shortly thereafter; and, lastly, cell phone records showed C.M.'s, Henry's, and Guillory's phones apparently leaving the area, eventually tracking them back to the apartment complex where the car had been borrowed. A couple of hours later, Guillory texted C.M. to say "send me that shit," to which C.M. responded by sending a link to a news story about Merchant's murder.

Additionally, Watson noted that Henry's fingerprint was found on a rear door of the Infiniti, which tended to corroborate his statement that he had opened that rear door. DNA evidence also linked Henry to the gun found at the scene. A fingerprint matching C.M. was found inside the white Altima on the rearview mirror. Watson's believes this corroborates that C.M. was the driver on the day of the shooting. Watson also noted that two .40 caliber casings found inside the white Altima were determined to be fired from the same gun as other casings found at the scene. Altogether, police determined that bullets were fired from three different

guns at the scene, which Watson believed corroborated Henry's statement that he, C.M., and Guillory had all fired guns at Merchant. One of the guns apparently used was later found in possession of a member of the same gang as C.M., Henry, and Guillory. No shell casings were traced to having been fired in the handgun that Merchant had on his person the day of his death.

Watson additionally discussed C.M.'s background with the criminal justice system, including that he had been arrested several times and "documented in different HPD offense reports." In one offense report, C.M., Guillory, C.M.'s brother, and two others were accused of robbing two people, including a homeless man in a wheelchair. In another report, C.M. was accused of participating in the theft of a vehicle. In a third report, C.M. was accused of evading arrest when police responded to a report of gunfire, and in a fourth, Ochoa and C.M. were linked together for evading arrest.

Watson also discussed C.M.'s history of gang participation, including membership in one gang known for robbing pharmacies. A subgroup of the gang allegedly included C.M., Guillory, and Ochoa and worked out of the area where the white Altima was borrowed.

On cross-examination, Watson acknowledged that Edwina had initially identified two other people as the ones who shot her husband rather than the people who were ultimately charged, but police had excluded the two as suspects due to other information. Watson explained that it was believed the two Edwina initially identified were involved in her son's prior murder but not in the murder of her husband. Watson stated he did not find Edwina to be a credible witness. Watson further acknowledged that the female witnesses discussed above had changed portions of their stories over time.

Watson also admitted that there was no evidence that anything was taken

from the scene of the shooting. He explained, however, that based on the totality of his investigation, the event appeared to be a robbery resulting in a death and not an "ambush kind of murder." He said that Henry's statement that a robbery was planned and attempted was the primary driver of that conclusion, but he emphasized that the investigation as a whole lead to that conclusion. He specifically noted the tow truck driver's testimony regarding armed men wearing masks. He also noted that in text messages before the shooting, Guillory said to Henry that they were "going to hit" and "that they're popping for 60 apiece," both of which Watson took to refer to a robbery motive, indicating that they stood to make $60,000 each from the robbery.

In responding to questions regarding how C.M. could have fired his weapon at Merchant from the driver's seat of the white Altima when it was the passenger's side of the vehicle that was closest to Merchant's position, Watson stated that it was possible he either shot over the roof or rolled the passenger side window down. The windows on the vehicle were operational. Watson also noted that if C.M. did shoot through the area of the passenger window, the spent casings would likely have gone into the backseat of the Altima, which is exactly where spent casings were found.

Dr. Christin Smith testified that she is the Harris County Juvenile Probation Department staff psychologist who completed the certification evaluation for C.M. Her report was also admitted into evidence at the hearing. Smith first described some of C.M.'s history, including running away from home, acquiring his first firearm when he was 14 or 15 years old, and the fact that his father, mother, and twin brother all had criminal histories. Smith said that C.M. told her that "[w]hen there were items or money that he needed, his means of obtaining those were through robbery." He received his first criminal charge, theft of a motor vehicle, in

10

September 2019, and was subsequently charged that November with robbery of a disabled man in a wheelchair.

After being placed on pre-adjudication supervision for the robbery charge, C.M. was deemed to have inadequate supervision at home and there was alleged tampering with his ankle monitor, resulting in an order for immediate custody. C.M. was subsequently accepted into the Gang Recidivism Intervention Program (GRIP), from which he graduated successfully in March 2021. In May 2022, C.M. received a third juvenile referral for evading arrest or detention after shots were reported fired in the vicinity. He was again adjudicated delinquent and placed in the Harris County Youth Village Boys Program, a residential center. While there, C.M. received group and individual services and was reported for eight behavioral incidents—most involving some form of aggression, such as fighting or having an aggressive tone with staff—and some refusals to attend school.

Smith further testified that according to her review, C.M. began associating with gangs when he was 12 or 13 years old and appeared to have been active in several gangs, including one that he started with his twin brother. A gang assessment of C.M. noted altercations with rival gangs. C.M. was exposed to domestic and community violence from a young age and had several friends who had violent deaths. In 2020, he had to relocate when his home was "shot up." C.M.'s grades were often good but had oscillated, and he had passed two portions of the GED test.

As part of her review, Smith conducted several tests on C.M. His overall intelligence tested as average for a youth his age, although above the typical level for the juvenile justice population. On his personality assessment inventory, Smith concluded that C.M.'s scores indicated successful treatment may be challenging due to defensiveness and lack of trust. Additionally, C.M.'s results on a self-

reported inventory revealed elevated scores for social maladjustment and value orientation that placed him at a higher likelihood of disregarding social norms and demonstrating behavior that could be considered anti-social or delinquent. Smith also classified C.M. as "group oriented," which she said under the circumstances indicated a below average chance of successful treatment and an above average probability for violent activity.

Smith assessed C.M.'s overall risk for dangerousness as being in the middle range compared to other adolescents in the juvenile justice system, whether the current alleged offense was considered or not. For violent and aggressive tendencies, she placed C.M. in the high range. Regarding sophistication and maturity, C.M. fell in the middle range, although Smith said that his maturity alone was in the high range. Smith said that C.M. struggled with behavioral norms related to right and wrong. For treatment amenability, he scored in the middle range. C.M. was able to identify some minimal feelings of guilt and remorse about past actions but more so about his punishment for those actions. Regarding the risk of violent reoffending, C.M. scored in the high range for a history of violence, parental caregiver criminality, poor parental management, poor school performance, peer group delinquency, and poor social and personal support.

Smith also noted that C.M. had positive social engagement while at the detention center, as he had joined the football and basketball teams and had no behavioral infractions while participating in those activities. She also stated that he scored well for a positive attitude towards intervention and authority because he requested and participated in treatment and had been compliant.

As to the factors relevant to waiver, Smith said that she looked at the seriousness of the crime and overall risk for violent reoffending as well as the youth's legal knowledge, level of dangerousness, criminal sophistication, level of

maturity, and amenability to treatment. In assessing C.M. without considering the current offense, Smith concluded that his criminal sophistication was in the average range and his dangerousness was in the above average range. When she considered the current offense, that elevated his criminal sophistication to above average. She found that his maturity and treatment amenability were both in the average range, whether the offense was considered or not. Regarding the risk of violent reoffending, Smith concluded that without considering the offense and if C.M. received no rehabilitation services, he would be at a moderately high risk. If the offense is also considered, that would elevate to high risk. Smith said she does not offer an ultimate opinion on whether the court should grant the certification and waive jurisdiction, but she does make recommendations regarding future treatment as a starting block for providers.

On cross-examination, Smith acknowledged that the first real structured treatment environment that C.M. had experienced was when he was sent to the Youth Village after the current offense was alleged to have occurred. In the past year, C.M. had been reported for only 11 infractions, and nine were school refusals. Smith said that C.M. had specifically sought out treatment, requesting both therapy and medication. She explained that sometimes juveniles pay "lip service" to the need for treatment and then their interest dwindles, but C.M. had actually increased his participation over time. When asked what struck her about C.M., Smith said that he was personable, polite, friendly, compliant, and motivated. Smith also noted that C.M. does not appear to take a leadership role in planning illegal acts. Lastly, Smith acknowledged that had she reviewed the treatments notes of Kailey Posterick, one of C.M.'s therapists, prior to testifying, she would have rated C.M. as high average for treatment amenability rather than average.

C.M. called Paula Huber to the stand who testified that she was C.M.'s therapist while he was at the Youth Village, from October 2022 until February 2023. She had also seen him a couple of times since then. Their sessions began after the offense charged in this case. When they began, he was open to therapy and warmed up quickly but was suffering from post-traumatic symptoms. She described him as "smart, charismatic, kind to those he knew[, and] willing to trust others once he got to know [them]." C.M.'s mother was very engaged and willing to participate in treatment. Huber said that C.M.'s family was a little dysfunctional "but definitely more willing to work on things than a lot of [her] current families." She said that he was still engaged in his treatment and requesting therapy and medication, which, she said, was a bit surprising. He had gotten better at understanding himself and how he came to be this way and at managing his symptoms, which include anxiety, nightmares, and hyper vigilance. C.M.'s empathy had increased through therapy. He had passed two parts of the GED, which Huber said was pretty rare for the youth they work with. His PTSD stemmed from witnessing domestic violence and friends being shot as well as his relationship with his father.

Huber estimated that she had worked with around a hundred youth during her time with the Juvenile Probation Department, and she said that C.M. was more willing to engage in long-term treatment and had more insight than other juveniles she has treated. His persistence was comparatively rare. She and C.M.'s current therapist, Posterick, had concluded that C.M. would be a good candidate for the Capital Offenders Program if he was adjudicated for the current offense as a juvenile.

On cross, Huber said she did not know how C.M. treated strangers because she had not observed him in that context. He had demonstrated growth by taking

accountability for his actions that had led to behavioral issues at the Youth Village. She did not do any testing and could speak to what his behavior would be outside of a juvenile facility. She had worked with other youth who were certified for trial as adults and for whom she agreed with the certification, but that was not the case with C.M.

Posterick testified that she is a therapist for the foundations program in the Juvenile Detention Center and was, at the time of the hearing, C.M.'s therapist. She described C.M. as very friendly, outgoing, and easy to work with as a client and as a resident in the facility. She said that most of the staff knew and got along with him very well. "He's very polite and a fun kid to work with." She thinks she knows him pretty well. He always seemed interested and eager and ready to talk in sessions. He had "very minimal" behavior issues at the facility and participated in football and a studio program where they recorded podcasts. He had requested and received additional study materials from her, which was unusual in her experience. He was motivated and taking an active role in his treatment.

Posterick explained that the Capital Offenders Program is a Texas Juvenile Justice Department (TJJD) program for youth who have committed a serious offense but have demonstrated an ability to safely interact in the general population at the facility. They also look for people who are open to treatment. She does not make the recommendation often; C.M. would be the fifth patient she had referred to the program out of 45 patients that she has seen discharged to TJJD. She explained that he has a demonstrated amenability to treatment and his progress had already been "exceptional." She defined "amenability" as not only a willingness to engage, but a willingness to actually apply the skills that they learn in treatment.

On cross-examination, Posterick acknowledged that she could not speak to how C.M. would behave if released back into the community. She also

15

acknowledged that the fact C.M. was potentially facing significant prison time if certified could have an impact on his behavior.

In its order waiving its exclusive jurisdiction, the juvenile court stated that C.M. had been charged with a felony occurring in 2022, for which there had been no adjudication; C.M. was 14 years of age or older at the time of the commission of the offense, having been born in 2006; there was probable cause to believe C.M. was guilty as charged; C.M.'s conduct required criminal proceedings for the welfare of the community; and C.M.'s background necessitated transfer to criminal court for the welfare of the community. The juvenile court further stated that in making these determinations, it considered that the offense was against a person and not just property, C.M.'s sophistication and maturity, his record and previous history, the prospects for adequate protection of the public, and the likelihood of rehabilitation.

### *Probable Cause*

In his first issue, C.M. contends that the evidence is legally and factually insufficient to support the juvenile court's conclusion that there was probable cause to believe that he committed capital murder. "'Probable cause' is defined as sufficient facts and circumstances to warrant a prudent person to believe the suspect committed . . . the offense." *In re C.M.M.*, 503 S.W.3d at 702. "Probable cause is based on probabilities; it requires more than mere suspicion but less evidence than that needed to support a conviction or support a finding by a preponderance of the evidence." *Id.* "Probable cause exists where the police have reasonably trustworthy information sufficient to warrant a reasonable person to believe a particular person has committed . . . an offense." *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997).

A person commits capital murder if he "intentionally or knowingly causes

the death of an individual" and "intentionally commits the murder in the course of committing or attempting to commit . . . robbery," among other possibilities. Tex. Penal Code §§ 19.02(b)(1), 19.03(a)(2). A person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id*. § 29.02(a).

A person may be convicted as a party to an offense, including capital murder, "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id*. § 7.01(a); *see also Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). The law of parties, set forth under Penal Code section 7.02, may be applied to a case even though no such allegation is contained in the indictment. *See In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013) ("Regardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence."); *see also Marable v. State*, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002) ("It is well-settled that the law of parties need not be pled in the indictment.").

Under Section 7.02(a)(2), a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Tex. Penal Code § 7.02(a)(2). And, under Section 7.02(b), a person is criminally responsible for an offense committed by another under a theory of conspiracy. *Id*. § 7.02(b).

Here, C.M. raises several specific evidentiary challenges to the juvenile court's finding of probable cause. First, C.M. asserts that the evidence did not

support the charge of capital murder where there was no evidence any of the alleged assailants knew Merchant would be at the scene and, at most, evidence indicated they went there to burglarize a home and not to commit the underlying offense of robbery. C.M. does not cite any authority suggesting that to be guilty of robbery, a person needs to know a particular victim will be at the location to be robbed, and we are aware of no such authority. *See generally* Tex. Penal Code § 29.02(a) (elements for robbery). Here, the finding of probable cause for capital murder based on an underlying offense of robbery was supported not only by Henry's direct admission that a robbery was planned and intended, but also by the statement of the tow truck driver that the assailants got out of their vehicle wearing masks and carrying guns and by the text message Guillory sent to Henry before the shooting, stating that they were "going to hit" and "that they're popping for 60 apiece," both of which Watson took to refer to a robbery motive.

Second, C.M. emphasizes the fact that neither of the alleged eyewitnesses at the scene identified C.M. as being one of the assailants, and, in fact, Edwina identified two other individuals as the men who shot her husband. Although certainly relevant to the probable cause analysis, the fact that neither witness identified C.M. is not dispositive. Watson stated that he did not find Edwina credible and indicated she may have had ulterior motives in making her statements, and the tow truck driver indicated he dove to the ground and did not see much shortly after the assailants arrived. The tow truck driver also noted that the assailants were wearing masks. C.M.'s identity as one of the assailants was otherwise sufficiently established by evidence, including Henry's direct statements that C.M. participated, text messages between alleged assailants indicating an intention to commit a robbery and encouraging other members of the group to ensure C.M. came along, statements by the women later discovered with the white

18

Altima that C.M. was one of the men that came back after borrowing the white Altima, the fact that C.M.'s cell phone contacted a cell phone tower in the area where the shooting occurred around the time of the shooting, and the video showing the white Altima in the area and even on the same street as the shooting immediately before the shooting. Additionally, C.M. sent a news story regarding Merchant's death to Guillory after the shooting. All of this evidence points to C.M.'s participation in the shooting.

Third, C.M. argues that Henry's statement that C.M. shot at Merchant from his position in the driver's seat did not make sense given the relative positions of the individuals involved. C.M. suggests that given the relative positioning, it would have been very difficult or awkward for someone to shoot at Merchant from the driver's seat of the white Altima over the roof of the vehicle or through the passenger side window. He also suggests that had he done so, he likely would have been shooting at the backs of the other assailants, as they had reportedly exited the white Altima and at least one had gone to the Infiniti and opened the rear door. Again, while these concerns are certainly relevant to the analysis and the believability of the evidence, they are not dispositive. Henry's statement did not say how C.M. shot from the driver's seat, whether he shot through the passenger window or rose up from the seat and shot over the roof. According to Watson, Henry's statement was corroborated at least somewhat by the fact that shell casings were found in the rear of the white Altima, which he explained would have likely been the result if someone had fired from the driver's seat. Moreover, the exact positioning of the assailants is not established well enough by the evidence to conclude C.M. would have been shooting at anyone other than Merchant had he fired from the driver's seat of the white Altima.

Lastly, C.M. states that there was no evidence to establish any theory under

19

the law of parties and no evidence that he intended Merchant's death under any possible scenario. C.M. does not develop either of these contentions beyond stating them. The evidence described above was legally and factually sufficient to show probable cause that C.M. was an active participant in planning and carrying out an armed robbery that resulted in many shots fired at the victim, including by C.M. himself. The evidence is legally and factually sufficient to support the juvenile court's finding of probable cause for capital murder. *See In re C.M.M.*, 503 S.W.3d at 701.

### *Section 54.02(m) Factors*

In his second issue, C.M. challenges the legal and factual sufficiency of the evidence to support the trial court's findings on the section 54.02 factors. *See* Tex. Fam. Code § 54.02(f). As set forth above, the juvenile court stated in its order waiving jurisdiction, that in making its determination, it considered four section 54.02(f) factors, including (1) that the offense was against a person, (2) C.M.'s sophistication and maturity, (3) his record and previous history, and (4) the prospects for adequate protection of the public and the likelihood of rehabilitation. "Any combination of these criteria may suffice to support a waiver of jurisdiction; not every criterion need weigh in favor of transfer." *In re C.M.M.*, 503 S.W.3d at 701.

**Type of offense.** The first factor weighs heavily in favor of transfer because C.M. was charged with a serious offense against a person, namely capital murder. *See* Tex. Fam. Code § 54.02(f)(1). Capital murder is, of course, a capital felony and a serious offense against a person. *See* Tex. Penal Code §§ 12.31 (capital felonies), 19.03 (capital murder). The allegations against C.M. involved a shooting in a neighborhood by C.M. and other alleged members of a gang.

**Sophistication and maturity.** The second factor, C.M.'s sophistication and

20

maturity, also weighs in favor of the transfer. "In assessing the sophistication and maturity of the child, the juvenile court places emphasis on whether the evidence shows that the child knew right from wrong and could assist his attorney in his defense." *See Bell*, 649 S.W.3d at 892. Evidence that the juvenile is not intellectually disabled and is capable of understanding the proceedings against him is also relevant to a determination of the juvenile's maturity and sophistication to support upholding a transfer decision. *See id*. at 893. How to weigh such evidence is generally within the juvenile court's discretion. *See id*.

Smith, the psychologist who evaluated C.M., rated him overall as having an average level of maturity and sophistication for his age. She noted that C.M. had rated himself as "high" for maturity, and she also rated his autonomy as high. According to Smith, C.M. demonstrated at least a basic understanding of court proceedings and the roles played by different participants, including his own attorney. She also noted that he understood that the loss of life is what made the capital murder charge so serious. Smith additionally rated C.M.'s level of intellectual and criminal sophistication as average when the charged offense was not considered, but she increased the criminal sophistication rating to above average when considering the current charge. Smith further reported that C.M. considered himself independent and "in control" and "has some awareness of wrongfulness," but she also noted that he struggles to delay gratification, has a quick temper, and does not always understand the reasons behind his emotions. Overall, the evidence supports the trial court's determination that C.M.'s sophistication and maturity support the waiver and certification. *See, e.g.*, *id*. (holding evidence was sufficient to support finding on sophistication and maturity element when child knew right from wrong and could assist attorney in his defense but was "functioning well below grade level").

**Record and previous history.** The third factor, C.M.'s record and previous history, also weighs heavily in favor of the transfer. As discussed above, C.M. has previously been charged and adjudicated for three other offenses, including robbery of a man in a wheelchair, auto theft, and evading arrest. Additionally, C.M. has a history of discipline issues at home and while in a juvenile facility, although it should be noted that C.M.'s two therapists who testified did not consider him a discipline problem and said he generally got along well with the staff at the facility.

C.M.'s history of gang affiliation is also concerning. *See, e.g.*, *id*. at 895 ("A juvenile court may give significant weight to a child's gang affiliation when assessing the child's previous history."); *In re S.G.R.*, 496 S.W.3d 235, 242 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("A juvenile court does not err by according significant weight to evidence of affiliation with a criminal street gang in connection with a child's record and previous history, as these gangs are by definition regularly engaged in criminal activities."). As discussed above, C.M. admitted he began associating with gangs when he was 12 or 13 years old. He also appeared to be active at the time of the charged offense in several gangs, including one he helped start and another with a penchant for robbing pharmacies. It is also worth noting regarding his history that C.M. told Smith that when he saw something he wanted, "[H]e would rob or ask for it." C.M. reported to Smith that he had acquired his first gun when he was 14 or 15, and offense reports indicated he had a history of posting pictures of himself on social media with guns. This evidence supports the trial court's determination that C.M.'s record and previous history supports the waiver and certification.

**Protection and rehabilitation.** Lastly, the fourth factor—which looks at the prospects for adequate protection of the public and the likelihood of reasonable

22

rehabilitation—also supports the trial court's determination. Under this factor, the trial court could again consider the serious nature of the offense C.M. allegedly committed, as well as his significant history of committing crimes and affiliating with violent gangs. *See, e.g.*, *Bell*, 649 S.W.3d at 897.

The evaluator, Smith, assessed C.M.'s overall risk for dangerousness as being in the middle range compared to other adolescents in the juvenile justice system, but for violent and aggressive tendencies, she placed C.M. in the high range if the charged offense is included. Specifically in regard to the factors for transfer, Smith stated that C.M. should be considered as an above average risk of dangerousness. As for reoffending, she stated that he was in the moderately high risk category if the subject offense is excluded but in the high risk category if the charged offense was considered. In coming to these conclusions, she specifically noted C.M.'s short temper and history of getting into fights, as well as his history with guns and gangs, and the fact that he tended to gravitate toward negative peer groups and had impulsively engaged in criminal activity.

In regard to the possibility of rehabilitation, Smith opined that C.M. had an average level of treatment amenability when compared to most juvenile offenders his age, based on his prior experiences with therapy and apparent openness to engaging in treatment but also considering his apparent defensiveness and lack of trust and the fact there was an indication in the testing that he might just "go through the motions." During her testimony, however, Smith acknowledged that she would have rated C.M. as high average for treatment amenability if she had been able to review Posterick's notes prior to making that determination.

Posterick, C.M.'s therapist at the time of the hearing, spoke very highly of his amenability to treatment, including that he was easy to work with, always seemed interested and ready to talk at sessions, had "very minimal" behavior

issues, participated in extracurricular programs, and had requested and received additional study materials from her. Posterick had also recommended C.M. for the Capital Offenders Program, which she had rarely done for juveniles in her care. She described his progress in therapy thus far as "exceptional." Posterick acknowledged, however, that she could not speak to how C.M. would behave if released back into the community.

Huber, a therapist who had previously treated C.M., also spoke highly of his amenability to treatment. She said that C.M. was more willing to engage in long-term treatment and had more insight than other juveniles she has treated and that his persistence in treatment was comparatively rare. She also noted that C.M.'s family appeared more willing to work on improvement than most families she dealt with. And, she said that he had passed two parts of the GED, which was pretty rare. Huber also acknowledged, however, that she did not do any testing and could not speak to what C.M.'s behavior would be outside of a juvenile facility.

Although Posterick and Huber made compelling cases for C.M.'s progress in and amenability to treatment, the evidence that he posed a continuing threat for dangerous and violent conduct if released into the community was sufficient to support the juvenile court's conclusion that this fourth factor weighed in favor of transfer.

**Juvenile court's discretion.** Concluding that sufficient evidence supports the juvenile court's findings under section 54.02(a) and (f), we move to the second step of the inquiry: whether the juvenile court's ultimate waiver decision was an abuse of discretion. *See In re C.M.M.*, 503 S.W.3d at 701. As described above, although there is evidence that C.M. was remarkably open to treatment and appeared to be mostly staying out of trouble while at the Youth Village, the evidence also indicated that C.M. has a troubling history of criminal conduct and

gang involvement, had participated in the commission of a very violent offense, and constituted a risk of future criminal and violent behavior in the community. Accordingly, we cannot say that the trial court acted outside of guiding rules and principles and abused its discretion in waiving its exclusive original jurisdiction and transferring C.M. to a criminal district court for trial as an adult. *See Thomas*, 623 S.W.3d at 380 (explaining that juvenile courts have substantial discretion in making a transfer decision.); *see also Nat'l Lloyds Ins.*, 507 S.W.3d at 226. We therefore overrule C.M.'s second issue on appeal.

We affirm the juvenile court's order.

/s/    Frances Bourliot
Justice

Panel consists of Justices Jewell, Bourliot, and Zimmerer.